**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTIN HECHT AS ADMINISTRATOR OF THE ESTATE OF DAVID F. GREENBERG,<br><br>Plaintiff,<br><br>v.<br><br>NEW YORK UNIVERSITY AND DEMOCRATIC SOCIALISTS OF AMERICA, INC.,<br><br>Defendants. | 1:25-cv-03042 (PAE)<br><br>**JOINT STATEMENT OF UNDISPUTED FACTS** |
| DEMOCRATIC SOCIALISTS OF AMERICA, INC.,<br><br>Counter-Claim Plaintiff and Cross-Claim Plaintiff,<br><br>v.<br><br>MARTIN HECHT AS ADMINISTRATOR OF THE ESTATE OF DAVID F. GREENBERG,<br><br>Counter-Claim Defendant,<br><br>-and-<br><br>NEW YORK UNIVERSITY,<br><br>Cross-Claim Defendant. | |

Pursuant to the Court's January 14, 2026 Order (ECF No. 47) and Section 3.K.1. of Your Honor's Individual Rules, Plaintiff Martin Hecht as Administrator of the Estate of David F. Greenberg ("Plaintiff"), Defendant New York University ("NYU"), and Defendant, Counter-Claimant, and Cross-Claimant Democratic Socialists of America, Inc. ("DSA" and collectively with Plaintiff and NYU, the "Parties"), respectfully submit this joint stipulation of facts as to which

1

there is no genuine dispute. The Parties do not stipulate that the facts set forth herein are relevant or material to any legal issue that any of them may present to the Court for consideration.

**The Parties**

1. David F. Greenberg ("Greenberg") was, during his lifetime, a professor employed by NYU and a participant in the New York University Retirement Plan for Members of the Faculty, Professional Research Staff, and Administration (TIAA Plan No. 102192) (the "Plan"). (NYU_000362-000400 (Document #1)).

2. The version of the Plan in effect at the time of Greenberg's death, amended and restated effective June 1, 2020 is attached hereto as Document #1. (NYU_000362-000400).

3. Greenberg was born in 1942.

4. Greenberg died intestate on July 12, 2024.

5. Greenberg was unmarried and had no children.

6. Plaintiff Martin Hecht is the nephew of Greenberg and is the duly appointed Administrator of the Estate of David F. Greenberg (the "Estate"). His appointment is evidenced by Letters of Administration and a Certificate of Appointment of Administrator issued by the Surrogate's Court of the State of New York, New York County.

7. NYU is a private university organized under the laws of the State of New York and, at all relevant times, sponsored the Plan and served as Plan Administrator within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA").

8. Defendant Democratic Socialists of America, Inc. ("DSA") is a nonprofit corporation organized under the laws of the District of Columbia and headquartered in New York City.

9. Upon Greenberg's death, a Plan benefit became payable, funded by certain retirement annuity contracts issued to him under the Plan.

**The NYU Retirement Plan**

10. The Plan is an employee pension benefit plan governed by ERISA.

11. Retirement benefits to participants of the Plan are funded in part through individual retirement annuity contracts issued to participants by authorized investment providers.

12. From January 1, 1952 until January 1, 1985, the Plan was named the NYU TIAA-CREF Retirement Plan; from January 1, 1985 until September 1, 1990, it was named the NYU Retirement Annuity Plan. (NYU_000366 (Document #1)).

13. Sections 2.11 and 2.12 of the Plan provides for both employer and employee contributions and applies the contributions toward either "Annuity Contracts" or "Custodial Accounts" for the benefit of Retirement Plan participants and their beneficiaries. (NYU_000366, NYU_000368-369 (Document #1)).

14. Section 2.3 of the Plan defines "Annuity Contract" to mean "a non-transferable annuity contract . . . selected by the University to which contributions under the Plan may be made and that is issued by an insurance company qualified to issue annuities in a state . . . and that includes payments in the form of an annuity." (NYU_000367 (Document #1)).

15. Section 2.7 of the Plan defines "Custodial Account" to mean "a custodial account, if any . . . selected by the University and established pursuant to a Custodial Agreement, to which contributions under the Plan may be made." (NYU_000367 (Document #1)).

16. Section 2.8 of the Plan defines "Custodial Agreement" to mean "an agreement between a custodian . . . and either a Participant or the University, under which assets of the Plan

are held in Custodial Accounts for Participants and invested in shares of regulated investment companies." (NYU_000367-68 (Document #1)).

17. Section 2.3 of the Plan provides that the provisions of each Annuity Contract are incorporated by reference into the Plan, so long as they are not inconsistent with the provisions of the Plan. (NYU_000367 (Document #1)).

18. The Plan provides, "To the extent any provision of the Plan is inconsistent with any provision of an Annuity Contract . . . the provision of the Plan will control." (NYU_000366 (Document #1)).

19. Section 2.5 of the Plan defines "Beneficiary" to mean "any person or entity designated by the Participant to receive a benefit from an Annuity Contract . . . on account of the death of the Participant." (NYU_000367 (Document #1)).

20. During the period relevant to this action, NYU selected annuity contracts provided by Teachers Insurance and Annuity Association of America–College Retirement Equities Fund ("TIAA").

21. During the period relevant to this action, NYU selected custodial accounts provided by The Vanguard Group, Inc. ("Vanguard").

22. Section 6.3(c) of the Plan provides: "In the case of a Participant who dies on or after his or her Annuity Starting Date, no benefits will be payable to a surviving spouse or other beneficiary after the Participant's death except to the extent provided in the form or forms of distribution in effect with respect to the Participant pursuant to Section 6.1." (NYU_000389 (Document #1)).

23. Section 7.6(a) of the Plan provides that, "[i]n the event of a dispute between the Vendor or Administrator and a Participant or Beneficiary over the amount of benefits payable

under the Plan," a Participant or Beneficiary "may file a claim for benefits by notifying the Administrator of such claim," that such notification "must be in writing and shall set forth the basis of such claim," and that the Administrator "shall decide whether to grant a claim within 90 days of the date on which the claim is received," unless "special circumstances require a longer period for review," in which case the claimant must be notified in writing within the initial 90-day period, and "no extension shall be longer than an additional 90 days beyond the original response deadline." (NYU_000393 (Document #1)).

24.     Section 2.31 of the Plan defines "Vendor" to include TIAA. (NYU_000372, NYU_000400 (Document #1)).

25.     Section 8.7 of the Plan provides that "[t]he Plan will be construed, administered and enforced according to the laws of the State of New York to the extent not preempted by federal law." (NYU_000396 (Document #1)).

26.     The summary plan description ("SPD") for the Plan states as follows:

**What Laws Govern the Plan?**

The Retirement Plan is governed by current tax and other federal law as well as the rulings of the Internal Revenue Service and the Department of Labor. The Plan will always be construed to comply with these laws and rulings. If there are any changes in applicable law or governmental rulings, the Plan will be amended as required to stay in compliance. You will be kept informed of any changes as may be required by law.

(NYU_000290 (Document #2)).

### Greenberg's Employment and Plan Account

27.     Greenberg was employed by NYU as a professor of sociology from September 1973 until his retirement in 2022.

28.     NYU's obituary for Greenberg states that he obtained his Ph.D. in physics in 1969 from the University of Chicago and then joined NYU's Sociology Department in 1973, noting his

"growing involvement in the social and political movements of that era." (DSA_1360 (Document #3)).

29. During the course of his employment, Greenberg participated in the Plan.

30. As of his retirement in 2022, Greenberg was fully vested in his benefits under the Plan.

31. Following his retirement, Greenberg remained a participant in the Plan.

32. Following his separation from service with NYU in 2022, Greenberg began receiving required minimum distributions from the Plan. (Document #4).

33. As of June 30, 2025, the balance in Greenberg's Retirement Plan account was $5,283,120.65.

34. On or about February 25, 1974, Greenberg executed an "Application for: TIAA Retirement Annuity Contract [/] CREF Retirement Unit-Annuity Certificate" (the "1974 Application)." (HECHT_0127-128 (Document #5)).

35. TIAA issued certificate numbers A6132193 / P6132190[1] (the "1974 Retirement Annuity Contract" or "RA Contract"). (HECHT_0127–128 (Document #5)).

36. On or about May 1, 1975, Greenberg executed an "Amendment to Application" for "Verification of Information on Application" with regard to the RA Contract (the "1975 Amendment"). (HECHT_0129 (Document #6)).

37. Greenberg made no further amendments or alterations to his Plan beneficiary designation.

38. The RA Contract, together with all amendments and endorsements in effect at the time of Greenberg's death, is attached hereto as Document #7 (NYU_000829–932).

---

[1] The TIAA Retirement Annuity Certificate Number is A6132193. The Companion CREF Retirement Annuity Certificate Number is P6132190.

39. The RA Contract provides an "Income Option" titled "Minimum Distribution Annuity" whereby "[i]f [the participant] die[s] before the Accumulation has been entirely paid out, a death benefit equal to the remaining Accumulation will be paid to the Beneficiary [the participant] names when electing this option." (NYU_000909 (Document # 7)).

40. A "Minimum Distribution Annuity Election Endorsement," effective December 15, 2023 (the "2023 Election Endorsement") evidencing an election under the RA Contract bearing Certificate Nos. A6132193 and P6132190, forms part of that contract. A true and accurate copy of the 2023 Election Endorsement is attached hereto as Document # 57.

41. Beneficiaries under the 2023 Election Endorsement are the same as "those otherwise designated under the contract and will receive the death benefit associated with the MD Election if [the participant] dies before the entire accumulation is paid out." (Document #57, p. E3).

42. The 2023 Election Endorsement defines "death benefit under the MD Election" to mean "the current value of [the participant's] accumulation units under the MD Election" which "will be paid to your beneficiaries under one of the methods set forth in Part E if [the participant] die[s] before the entire accumulation is paid out." (Document #57, p. E3).

43. Part E ("Death Benefit") of the 2023 Election Endorsement states that "if [the participant] dies before the entire accumulation under the MD Election is paid out, TIAA will pay the death benefit to your beneficiary..." (Document #57, p. E6).

44. The RA Contract provides that the certificate issued thereunder (Nos. A6132193 and P6132190) "is made and delivered and is to be performed in the State of New York," and that the "validity and effect of the certificate are governed by the laws" of New York. (NYU_000932, ¶ 19 (Document # 7)).

7

45.     In addition to the RA Contract, TIAA issued to Greenberg pursuant to the Plan (i) a Group Supplemental Retirement Annuity, contract number GSRA-102192GS1001, bearing certificate numbers L30977S6 / M30977S4[2] (the "GSRA Contract"), issued June 1, 2018 in connection with the Plan's recordkeeper consolidation, and (ii) a Retirement Choice contract bearing certificate numbers F1776563 / H1776569[3] (the "RC Contract").

46.     The RA Contract, the GSRA Contract, and the RC Contract were each issued pursuant to and governed by the Plan .

47.     The GSRA Contract, together with all amendments and endorsements in effect at the time of Greenberg's death, is attached hereto as Document #8 (NYU_000952–001055).

48.     The GSRA Contract was issued as a negative enrollment that carried forward the beneficiary designation in effect under the RA Contract. (NYU_001092–1093 (Document #11)).

49.     Part G of the GSRA Contract provides that the "death benefit will be paid to [the participant's] estate in one sum if [the participant] name[s] the estate as beneficiary, if none of the beneficiaries [the participant] ha[s] named is alive at the time of [his] death, or if at [the participant's] death, he had never named a beneficiary."  This section further provides "[i]f distributions to a named beneficiary are barred by operation of law, the death benefit will be paid to [the participant's] estate." (NYU_000977, ¶ 48 (Document #8)).

50.     Part A of the GSRA Contract provides that "[t]he Contract under which this Certificate was issued was made and delivered in the State of New York [and] [t]he validity and effect of all rights and duties under the Contract are governed by the laws there in force." (NYU_000954 (Document #8)).

---

[2] The TIAA Retirement Annuity Certificate Number is L30977S6. The Companion CREF Retirement Annuity Certificate Number is M30977S4.
[3] The TIAA Retirement Annuity Certificate Number is F1776563. The Companion CREF Retirement Annuity Certificate Number is H1776569.

51.     A TIAA brochure titled "NYU Retirement Program Information" concerning the RC Contract was addressed to Greenberg on an unidentified date. (Depo. Exh. 11 (Document #10)).

52.     The welcome package brochure states that Greenberg's primary beneficiaries are his parents and his contingent beneficiary is the New American Movement ("NAM"). (Document #10, p. 3).

53.     TIAA sent the welcome package brochure to Greenberg upon a change in the TIAA products offered by the Plan.

54.     The brochure bears a 2025 copyright date, which post-dates Greenberg's death on July 12, 2024. (Document #10, p. 12).

55.     The 1974 Application designated Greenberg's parents, Louis E. Greenberg and Mina Greenberg, as Primary Beneficiaries. (HECHT_0127–128 (Document #5)).

56.     At the time of Greenberg's death, his parents were deceased.

57.     The 1974 Application designated the New American Movement ("NAM"), with an address in Minneapolis, Minnesota, as Contingent Beneficiary. (HECHT_0127–128 (Document #5)).

58.     Pursuant to the 1975 Amendment, Greenberg changed NAM's address to Chicago, Illinois, and revised the contingent beneficiary designation to read: "The New American Movement … or any successor thereof. If at the death of [Greenberg] said [NAM] or a successor thereof is in existence; otherwise to the executors or administrators of [Greenberg]." (HECHT_0129 (Document #6)).

59.     The GSRA Contract and RC Contract follow the beneficiary designation in effect under the RA Contract. (NYU_001092–1094; NYU_0001060 (Document #11)).

60. Greenberg also participated in the New York University Supplemental Tax Deferred Annuity Plan ("STDA Plan").

61. The STDA Plan is an ERISA-governed defined contribution retirement plan established by NYU in 1989.

62. On or about December 4, 1996, Greenberg executed an enrollment form and investment selection form for the STDA Plan entitled "Vanguard Section 403(b)(7) Custodial Account -- Supplemental Plan" (Vanguard Plan No. 90789)(the "Vanguard Account"). (NYU_000741–43 (Document #12)).

63. The enrollment form designated Dena Karzen and Arline Tufano, Greenberg's sisters, as Primary Beneficiaries in equal shares. (NYU_000743 (Document #12)).

64. Plaintiff and NYU agree that the Vanguard Account was transferred to TIAA, which was (and is) the recordkeeper of the Plan. (ECF No. 14, ¶ 42.)

65. According to an email from TIAA after Greenberg's death, "The RCP/RP contract F543FTV4 / H543FTV0 was issued in April of 2024 and carried over the bene information from GSRA contract L18219S9, which was an account received via an asset takeover from Vanguard. The designation provided in welcome pkg for L18219S9 listed Aline Tufano and Dena Karzen as primary beneficiaries." (NYU_001092 (Document #11)).

### The Historical Relationship Between NAM and DSA

66. NAM was founded in 1971. Joseph M. Schwartz, "A History of Democratic Socialists of America 1971-2017" (DSA_1322 (Document #13)).

67. NAM was never incorporated and operated as an unincorporated association. (DSA Resp. to Pl.'s Am. Req. for Admis. No. 2 (Document #14)); (DSA_00140 ("Casey Memorandum") (Document #15)).

68. NAM operated under a constitution and bylaws, which prescribed NAM's membership rules, chapter rules, annual convention procedures, referendum procedures, leadership structure, and procedures for amending the constitution. (Depo. Exh. 2 (Document #16)).

69. NAM's constitution provides that its leadership consists of (a) the Expanded National Interim Committee ("E-NIC"), composed of members of the National Interim Committee ("NIC") plus regional representatives and meeting twice per year; (b) the NIC, an elected body constituting "the highest political and administrative body of NAM" outside of the national convention and the E-NIC; and (c) the Political Committee, the "full-time paid national leadership body." (DSA_4-5, §§ VI, VII, VIII (Document #16)).

70. NAM published a bi-monthly magazine, *Moving On*, and a roughly thrice-yearly *Discussion Bulletin* containing essays and other materials submitted by NAM members.

71. DSOC was founded in 1973. Harry Fleischman, "DSOC and NAM Hold Unity Talks*," Democratic Left*, Mar. 1981, p. 6. (DSA_1723 (Document #17)).

72. DSOC's monthly publication was *Newsletter of the Democratic Left*, later shortened to *Democratic Left*. (DSA_1719 (Document #17)).

73. DSOC was never incorporated and operated as an unincorporated association. (DSA_00140 (Document #15)).

74. A memorandum titled "*DSA As Organizational Labyrinth: Everything You Were Afraid To Ask And Are Still Not Sure You Want To Know*," prepared by Leo Casey of DSA's National Executive Committee (the "Casey Memorandum"), appears in the record. (DSA_00140–00142 (Document #15)).

75. The Casey Memorandum states that "[b]oth NAM and DSOC had operated as unincorporated membership associations" prior to 1982. (DSA_00140 (Document #15)).

76. The Casey Memorandum explains that, following the Detroit convention at which NAM and DSOC combined, the National Executive Committee "voted unanimously to adopt a legal organizational structure which was different from both of our predecessor organizations." (DSA_00140 (Document #15)).

77. The Casey Memorandum states that "[t]he choice [for DSA] was between two options: registration as an unincorporated membership organization qua political committee under section 527 of the I.R.S. code, or registration as a not for profit corporation under section 501.c.4 of the I.R.S. code." (DSA_00141 (Document #15)).

78. The Casey Memorandum further states that the National Executive Committee voted to "incorporate DSA as a not for profit corporation" and to seek recognition under § 501(c)(4) of the Internal Revenue Code. (DSA_00140 (Document #15)).

79. The Casey Memorandum explains that incorporation was selected as the organizational structure for DSA, in part, to avoid the potential personal financial liability to which officers could be exposed if the organization operated as an unincorporated membership association. (DSA_00141 (Document #15)).

80. DSOC was a national political organization active during the 1970s and early 1980s, maintained a national board, published a periodical titled *Democratic Left*, and held national conventions. (*E.g.*, DSA_01892–1906 (Document #58)).

81. *Moving On* reported, "In July 1978, *Socialist Review* ran a major article by Harry Boyte, in which he urged that NAM and [DSOC] merge. This idea had surfaced before, but this was more serious: Boyte was one of the founders of NAM and a long-time national leader."

Richard Healey, "Towards Merger," *Moving On*, Sept./Oct. 1981, p. 11 (DSA_1886 (Document #18)).

82.  In March 1979, *Democratic Left* reported that at DSOC's biennial convention, a committee was appointed to "explore merger possibilities with the 800-member [NAM]." David Hoffman, "DSOC Convention: New Goals Set, Anti-Carter Mood," *Democratic Left*, Mar. 1979, pp. 1, 3 (DSA_1702 (Document #19)).

83.  According to *In These Times*, "When DSOC's proposal was made, it prompted only about 15 percent of both organizations' active members to set up opposition caucuses. But the negotiations still took three years to complete." John Judis, "On the left, a match made in Detroit," *In These Times*, Mar. 30-Apr. 6, 1982, p. 5 (DSA_2405 (Document #20)).

84.  At NAM's August 1979 convention, "NAM responded positively to an initiative from [DSOC] for exploration of common concerns." Tom Lonergan, "NAM Convention," *Moving On*, Oct./Nov. 1979, p. 6 (DSA_1803 (Document #21)).

85.  At the August 1980 NAM convention, a resolution to enter into negotiations for a possible combination with DSOC passed 404 to 208, and mandated election of an eight-member negotiating committee "to begin negotiations with DSOC as soon as possible." Judy Johnson, "New American Movement Convention '80," *Moving On*, Sept./Oct. 1980, p. 6 (DSA_1825 (Document #22)).

86.  From 1979 through 1981, NAM published meeting minutes, draft proposals, and commentary on the potential combination in its *Discussion Bulletin*. (*E.g.*, DSA_1180-1221 (Document #24); DSA_856-861 (Document #50)).

13

87.     During 1981 and 1982, NAM and DSOC engaged in discussions concerning organizational unity and the potential formation of a new organization. (*E.g.*, DSA_01899–1906 (Document #58)).

88.     In its issue of May/June 1981, *Moving On* reported, "NAM and [DSOC] have been engaged in formal merger negotiations the past few months. On April 4-5 the Negotiating Committees met in New York City and reached a political agreement for the unification of NAM and DSOC acceptable to a large majority of both Committees. This political agreement will be voted on at the DSOC Convention in May and the NAM convention in July. If both Conventions approve this agreement, NAM and DSOC will engage in final negotiations on structural matters in the Fall and look forward to a unity Convention next spring." "All the News," *Moving On*, May/June 1981, p. 13 (DSA_1872 (Document #23)).

89.     The Spring 1981 *Discussion Bulletin* included an introduction summarizing the negotiations to date, the "Points of Political Agreement" adopted by the negotiators, a resolution by the NIC, a report on the 1981 DSOC convention, and several commentaries. (DSA_1180-1221 (Document #24)).

90.     A March 1981 issue of *Democratic Left* reports that the DSOC National Board authorized "negotiations and discussion between DSOC and NAM," and instructed a negotiating committee to meet with a corresponding NAM committee to address "political principles and organizational procedures of unification." (DSA_01731 (Document #17)).

91.     The March 1981 issue of *Democratic Left* states that "[d]iscussions of unity between NAM and DSOC will continue" and refers to the possibility that "a merger will occur," depending upon the outcome of those discussions. (DSA_01732 (Document #17)).

92.    *Democratic Left* reported that at DSOC's May 1981 convention, a resolution authorizing "final negotiations toward merger with NAM" was adopted with no negative votes. Harry Fleischman, "Along the Road to Unity," *Democratic Left*, June 1981, pp. 6-7 (DSA_1739-40 (Document #25)).

93.    In June 1981, *Democratic Left* reported that the local Milwaukee chapters of NAM and DSOC had formed a "combined DSOC-NAM organization," called "Democratic Socialist Alliance." Jo-Ann Mort, "New Faces, New Titles," & Harry Fleischman, "On the Left," *Democratic Left*, June 1981, pp. 12, 14 (DSA_1745, 1747 (Document #25)).

94.    *Moving On* reported that members of NAM and DSOC had organized a joint Southern conference in Tennessee. *See* Laura Batt, "Southern Socialists 'Come Out,'" *Moving On*, June/July 1981 p. 3 (DSA_1846 (Document #26)).

95.    A flyer for NAM's 1981 convention notes, "We will vote on a document that will be the political basis of unification with" DSOC. (DSA_1308 (Document #27)).

96.    A "Resolution on the Political Basis for the Unification of NAM and DSOC" was adopted at NAM's 1981 convention. (DSA_17-18 (Document #28)).

97.    A "Name Resolution" adopted at the 1981 convention recommended to the NAM Negotiating Committee that "a new name is appropriate for a new merged organization." (DSA_17-18 (Document #28)).

98.    Reporting on the 1981 convention, *Moving On* wrote, "The merger vote is the major 'news' of the Convention. On August 1, at 11:30 a.m., NAM members voted 448 to 59 in favor of merger with DSOC, and in support of the political principles of unity written by the joint NAM/DSOC Negotiating Committee. For most, the mood after the vote was one of jubilation –

15

members rose to their feet in applause." Debby Goldman, "Convention 1981," *Moving On*, Sept./Oct. 1981, pp. 6-7 (DSA_1881-82 (Document #18)).

99.     On October 17, 1981, NAM's NIC passed resolutions pertaining to the NAM/DSOC negotiations. (DSA_1903 (Document #29)).

100.    On November 14 and 15, 1981, the NAM E-NIC passed resolutions advising the NAM negotiating committee. (DSA_1919 (Document #30)).

101.    On November 23, 1981, NAM's Holly Graff and DSOC's Ben Tafoya wrote, "The Negotiating Committees of [DSOC] and [NAM] met on November 21-22 and successfully concluded negotiations to unify the two organizations. . . . The agreement (which is subject to the internal ratification processes of each organization) calls for the unity meeting to occur in Detroit, Michigan, over the weekend of March 20-21, 1982." (DSA_00040 Document #31)).

102.    A document entitled "DSOC/NAM Merger Agreement" states that it, together with an attached constitution for the merged organization, an outline of its bylaws, and a statement of "Points of Political Agreement" has been "jointly agreed to by duly elected negotiating committees of the two organizations." (Document #32, § I(A)(1)(a)).

103.    The "Merger Agreement" states that it requires ratification by both organizations. (Document #32, § I(A)(1)(c)).

104.    The "Merger Agreement" leaves the name for the unified organization blank and indicates that it will be based on an advisory poll conducted in both organizations. (Document #32, § I(B)(1)(a)).

105.    The "Merger Agreement" specifies that "[i]n order to build upon the established political recognition of both organizations," a "transition strategy" will be employed for adopting the new name, whereby at the merger convention the name will be "DSOC/NAM (soon to become

16

___)"; at a planned October 1982 unity celebration, "the name shall officially become ___ (formerly DSOC/NAM)"; and at the new organization's first convention in October 1983, "the name shall officially become ___ without references to DSOC or NAM in the name." (Document #32, § I(B)(1)(b)).

106. The "Merger Agreement" provides that "formal merger" will involve a "merger convention" to be held in Detroit, beginning with separate concurrent meetings of the two organizations. (Document #32, § I(B)(2)(a)).

107. The "Merger Agreement" states that at the conclusion of the separate meetings, "each organization will formally dissolve in order to constitute the unified organization at the subsequent merger convention." (Document #32, § I(B)(2)(a)).

108. The "Merger Agreement" states that elections of officers and NEC members apportioned to each organization will take place at the merger convention. (Document #32, § I(B)(2)(c)).

109. The "Merger Agreement" also prescribes agenda items for a meeting of the to-be-elected NEC immediately following the merger convention. (Document #32, § I(B)(3)).

110. For the new organization, the "Merger Agreement" sets a required schedule of leadership meetings (Document #32, § I(C)(1)); prescribes dates and procedures for a "unity celebration" and the first regular convention (Document #32, § I(C)(2), (3)); prescribes a structure for the new organization as to officers, staff, and leadership bodies, allocating the selection of these individuals between NAM and DSOC (Document #32, § II(A), (B)(1), (2)); establishes rules for merging local chapters (Document #32, § II(C)(1)); directs that the current DSOC national office in New York will become the new organization's national center, while the current NAM national office in Chicago will become the new organization's Chicago branch office (Document #32, §

17

II(C)(2)); discusses the new organization's finances, including potential incorporation (Document #32, § II(C)(3)); states that "the national office staff will begin coordinating joint work between the two organizations immediately" (Document #32, § III(A), (B)(2)); and establishes publishing schedules and apportions editorial board positions for the new organization's publications, to be called *Democratic Left* and *Socialist Forum* (Document #32, § III(C)(1)).

111.    A memo from DSOC's Ben Tafoya to DSOC's Temporary Interim Committee in August 1981 reports on the NAM convention, stating that there was "no serious obstacle to merger" and that the resolution on the merger had been adopted by a vote of 454-59-22. (DSA_32 (Document #33)).

112.    In a separate report entitled "Next Steps on Unity," following the August 1981 NAM convention, Ben Tafoya notes that "major areas for discussion" include "[n]ew constitution, merged leadership structure," "[i]ntegration of staff and finances," "[i]ntegration of locals," "[i]ntegration of commissions, projects, publications, literature, etc.," and "[n]ame." (DSA_134 (Document #34)).

113.    On January 12, 1982, NAM circulated to its chapters job announcements for two DSA staff positions allocated to NAM and two DSA officers to be elected by NAM, with instructions for submitting job applications and candidate statements. (DSA_2072-77 (Document #35)).

114.    On January 27, 1982, the NAM Political Committee wrote to the DSOC NEC and National Board regarding budgetary concerns for the new organization, noting that "[c]urrently NAM's debt stands at $5,687"; and "[w]e have followed an austerity approach to salaries and staff travel over the last several months in order to minimize the debt that NAM would bring to the new organization." (DSA_1920-21 (Document #36)).

115. Both organizations had income from membership dues, donations, publication subscriptions and advertising, literature sales, conferences, and events. (DSA_2017 (Document #37)).

116. A NAM memo of January 27, 1982, from Holly Graff and Bill Barclay states, "We propose retiring $50,000 of the combined DSOC and NAM debt during 1982. This would leave the new organization with approximately $45,000 in debt at the beginning of 1983, about 10% of the budget." (DSA_1926 (Document #38)).

117. A flyer from 1982 advertises the "7th Annual DSOC/NAM (soon to be DSA) YOUTH CONFERENCE" and includes an information request form to be returned "to DSOC/NAM (soon to be DSA)" in New York. (DSA_139 (Document #39)).

118. A subsequent iteration of the "Merger Agreement" states that it has been ratified by both organizations and that the name "Democratic Socialists of America" has been selected for the new organization. (Document #40, Depo. Exh. 4, §§ I(B), II(A)).

119. The ratified agreement covers the same topics as the previous agreement as to matters such as the merger convention, now to be held on March 20, 1982 in Detroit (Document #40, § II(B)); meeting schedule (Document #40, § II(D)); structure and finances of the new organization and apportionment of positions between NAM and DSOC (Document #40, §§ III, IV); plan for incorporation (Document #40, § IV(C)(2)); and political priorities and publications (Document #40, § V).

120. The ratified agreement states that for "any decisions requiring separate actions by DSOC and NAM" and any unresolved issues between the negotiating committees, "members of the unified organization's National Executive Committee selected by DSOC shall constitute 'DSOC', and NEC members selected by NAM shall constitute 'NAM'." (Document #40, § I(D)).

121.     A letter dated February 2, 1982, from the NAM Political Committee states that it is enclosing the merger agreement, constitution, and a referendum ballot, and states that out of a recent DSOC leadership meeting "came a quite satisfactory proposal for final budget planning that mandates maximum NAM role in implementing the negotiated decisions around staff, offices, outreach, commissions, etc. (see relevant sections of the merger agreement for these decisions)." (Depo. Exh. 8, p. 1 (Document #41)).

122.     The February 2, 1982 letter states that the name "Democratic Socialists of America" has been recommended for the new organization. (Document #41, p. 1).

123.     A letter dated February 19, 1982, from Bill Barclay of the NAM negotiating committee states that DSOC has debt of almost $96,000, that this debt will require ongoing budget negotiations, and that "[f]ortunately, the merger agreement was drawn with such contingencies in mind, authorizing the NAM portion of the new NEC to act for NAM and the DSOC portion to act for DSOC." (DSA_02000 (Document #42)).

124.     A February 22, 1982, mailing from the NAM Political Committee includes statements by NAM candidates for the fourteen new NEC positions allocated to NAM. Candidates emphasized their NAM backgrounds, with thirteen out of twenty candidates reporting current or prior national leadership positions in NAM. (DSA_2084-2107 (Document #43)).

125.     In the course of negotiations, NAM's *Discussion Bulletin* reportedly published more than 60 articles on the question of merger with DSOC. Richard Healey, "Towards Merger," *Moving On*, Sept./Oct. 1981, p. 12 (DSA_01887 (Document #18)).

126.     A flyer for the unity convention advertised as follows:

**The DEMOCRATIC SOCIALIST ORGANIZING COMMITTEE**
**and**
**The NEW AMERICAN MOVEMENT**
*are Joining Forces!*

On March 20, 1982, the two major democratic socialist forces in the
United States will meet in Detroit to create

**The DEMOCRATIC SOCIALISTS OF AMERICA**

(DSA_00135 (Document #45)).

127. An article in the March 1982 *Democratic Left* announced, "At last! On March 20-21, 1982 DSOC and NAM delegates from all over the country will come to Detroit to ratify the merger of their organizations and give birth to the Democratic Socialists of America (DSA)." Sancra Chelnov, "DSOC/NAM > Democratic Socialists of America," *Democratic Left*, Mar. 1982, p. 5 (NYU_807 (Document #46)).

128. *Moving On* reported that on March 20, 1982, "delegates from [NAM] and [DSOC] will come together to begin the founding of the Democratic Socialists of America (DSA)." Holly Graff, "NAM and DSOC: Merger becomes a reality," *Moving On*, Mar. 1982, p. 10 (NYU_796 (Document #46)).

129. Representatives of NAM and DSOC convened at a joint convention in Detroit in March 1982. (DSA_00040 (Document #31); DSA_00043 (Document #47); Depo. Exh. 4 (Document #41); DSA_00066; NYU_803 (Document #46)).

130. An announcement dated March 20, 1982, states, "The Detroit DSOC/NAM welcomes you to Detroit and to the founding convention of the Democratic Socialists of America. In anticipation of the DSOC/NAM merger, our Detroit locals united in January 1982 and now have a joint executive board and local membership. . . . [¶] We in Detroit DSOC/NAM look forward to being Democratic Socialists of America – Detroit." (DSA_2079 (Document #48)).

131. A note from the editors in the March 1982 issue of *Democratic Left* states that "[w]ith this issue, Democratic Left becomes the publication of the organization formed by the

unification of the Democratic Socialist Organizing Committee and the New American Movement." (NYU_804 (Document #46)).

132. The issue of *In These Times* for March 31-April 6, 1982, carried the headline "Left makes a deal – NAM and DSOC merge." (DSA_2397 (Document #20)).

133. An April 1982 issue of *Democratic Left* reports that representatives of DSOC and NAM convened in Detroit on March 20, 1982 and that the organizations "joined … to become the Democratic Socialists of America." (DSA_01787 (Document #49)).

134. The April 1982 issue of *Democratic Left* references conventions of both organizations at which a constitution for the newly formed organization was ratified, describes the signing of a "merger document," and includes photographs and narrative accounts of the Detroit convention attended by representatives of NAM and DSOC. (DSA_01787 (Document #49)).

135. The April 1982 issue of *Democratic Left* refers to DSA as "[t]he new organization." (DSA_01787 (Document #49)).

136. *In These Times* reported, "The first item on the convention agenda was the dissolution of the old organizations and separate ratification of the new one. DSOC and NAM gathered in separate rooms. . . . NAM's finale resembled the last moments of a '60s commune, with tributes, tears and raised fists." (DSA_2406 (Document #20)).

137. Materials published by NAM in 1981 reference its anticipated dissolution in connection with its combination with DSOC.

138. NAM published a document titled "Convention Resolutions (1981)," a true and accurate copy of which is attached hereto as Document #28 (DSA_00015-31).

139. The "NAM/DSOC Resolutions" within the "Convention Resolutions (1981)" use the terms merger and unification interchangeably. (DSA_00017-18 (Document #28)).

140. NAM published *Discussion Bulletin No. 35* ("Spring '81") titled "Labor ... NAM & DSOC ... Women Organizing" ("*Discussion Bulletin No. 35*") excerpts of which are attached hereto as Document #24 (DSA_01180-01307).

141. A subsection of *Discussion Bulletin No. 35* titled "NAM and DSOC" uses the phrases "unification of NAM and DSOC" and "newly unified organization" interchangeably with the term "merger" in describing the proposed combination of NAM and DSOC. (DSA_01184–1218 (Document #24))

142. An unsigned document titled "DSOC / NAM Merger Agreement Outline" appears in DSA's production. A true and correct copy of that document is attached hereto as Document #32 (DSA_00047-64).

143. The "DSOC / NAM Merger Agreement" provides that "[t]he provisions of this agreement shall be in effect from the formal dissolution of [NAM and DSOC] and their concurrent merger at a joint convention in March, 1982." (DSA_00048 (Document #32)).

144. An article titled *"Two Political Problems,"* authored by Rick Kunnes, NAM National Secretary, refers to a "newly founded formation initiated by NAM and DSOC." (DSA_00954 (Document #50)).

145. NAM "ceased to exist as an unincorporated association" on or about March 1982. DSA Resp. to Pl.'s Am. Req. for Admis. No. 3. A true and correct copy of DSA's Responses to Plaintiff's Amended Requests for Admission is attached hereto as Document #14.

146. By about April 1982, DSA's letterhead read, "Democratic Socialists of America, formerly DSOC/NAM." (DSA_123-24 (Document #51)).

147. In October 1982, DSA's letterhead read, "DSA – Democratic Socialists of America," with a footer reading, "formerly Democratic Socialist Organizing Committee/New American Movement." (DSA_126 (Document #52)).

148. Another flyer from the period is entitled "DSA – the New Socialists – Democratic Socialists of America*," with "*Formerly the Democratic Socialist Organizing Committee/New American Movement." (DSA_138 (Document #53)).

149. In April 1982, *Democratic Left* reported, "After almost three years of negotiations, [DSOC] and [NAM] joined in Detroit on March 20 to become [DSA]." *Democratic Left*, Apr. 1982, p. 6 (DSA_1787 (Document #49)).

150. *Democratic Left* described the backgrounds of new DSA officers and staff, including Field Director Leo Casey, who "has been on the NAM national committee"; Program Director Holly Graff, who became "part of NAM's political committee two years ago" and "served for several years in NAM's national leadership"; and "West Coast Regional Office staffer Jim Schoch," who "served on the steering committee of San Francisco NAM." *Democratic Left*, Apr. 1982, pp. 6-7 (DSA_1787-88 (Document #49)).

151. *Democratic Left* noted that Glenn Scott and Bill Barclay, members of the DSA NEC, were formerly NAM's Southern organizer and a member of the Political Committee of NAM, respectively. *Id.*, p. 13 (DSA_1794 (Document #49)).

152. *Democratic Left* noted that certain letters to the editor "were written before DSOC merged with NAM to become DSA." *Democratic Left*, Apr. 1982, p. 15 (DSA_1796 (Document #49)).

153. DSA was incorporated under the laws of the District of Columbia in 1982. (DSA's Responses to Plaintiff's RFA No. 1 (Document #14); NYU_000819-820 (Document #46)).

154. The Certificate and Articles of Incorporation of DSA reflect a filing date of April 19, 1982. (NYU_000819-824 (Document #46)).

155. DSA's Articles of Incorporation do not reference NAM. (NYU_000821–824 (Document # 46)).

156. Upon incorporation, DSA was organized as a social welfare organization within the meaning and purpose of § 501(c)(4) of the Internal Revenue Code. (NYU_000821 (Document #46)).

157. DSA has never filed any document with any state or federal authority reflecting or effectuating a merger with NAM.

158. The inaugural issue of DSA's *Socialist Forum* published a memo dated May 27, 1982, describing a "DSA Financial Crisis" stemming from debt carried over from DSOC and NAM. (DSA_2238-43 (Document #54)).

159. The issue also includes a memo on "formerly DSOC/NAM" letterhead and a membership form referring to "Members of [DSA], formerly DSOC/NAM." (DSA_2210, 2249 (Document #54)).

160. The Winter 2002 issue of Democratic Left includes a remembrance of Gordon Haskell, "one of the first directors of the newly merged [DSA] in the early 1980s" in the "unwieldy organizational structure that was produced by the merger of DSOC and NAM to form DSA." (DSA_2429, 2441 (Document #55)).

161. The remembrance credits Mr. Haskell with being "instrumental in helping the fledgling DSA overcome a financial deficit it had inherited from one of its predecessor organizations." (DSA_2441 (Document #55)).

162. In the last decade, DSA has repeatedly posted on social media about its roots in NAM and DSOC, including posts from 2016, 2017, 2018, 2022. (DSA_1690, 1692-93, 1695-98 (Document #56)).

163. DSA's electronic membership records began in 1993.

164. DSA's records include an entry for "David Greenberg" reflecting dues payments from December 31, 1992 through March 31, 2025, and listing the address as "1306 Sunnyside Ave, Highland Park, Illinois 60035," a property now owned by the Martin P. Hecht Revocable Trust. (DSA_00220-00223 (Document #59)).

165. DSA records reflect a payment dated March 31, 2024 associated with an account in the name of "David Greenberg." (DSA_00223 (Document #59)).

166. Greenberg resided in New York from 1973 until his death in 2024.

167. DSA has no membership records from before 1993.

168. Prof. Schwartz's "History" opines that "DSA made an ethical contribution to the broader American Left by being one of the few radical organizations born out of a merger rather than a split." (DSA_1322 (Document #13)).

**NYU's Administration and Pre-Litigation Investigation Following Greenberg's Death**

169. On September 23, 2024, TIAA representative Arlene Mayfield ("Mayfield") emailed DSA representative Ashik Siddique ("Siddique"), stating that "New American Movement is a beneficiary on some accounts here at TIAA" and requesting a Certificate of Merger. (NYU_000785 (Document #46)).

170. On October 8, 2024, Siddique responded, "I am looping in Christian Noland, our Finance Director . . . and we can figure out how to follow up." (NYU_000784 (Document #46)).

171. On October 10, 2024, Noland responded to Siddique's email, stating that DSA had "looked into this on our end" and that "NAM actually merged with the Democratic Socialist Organizing Committee." Noland wrote that "[t]he merger happened preceding the Democratic Socialists of America (DSA) filed (sic) the articles of incorporation," and that DSA "cannot find an online record of the merger." (NYU_000783-84 (Document #46)).

172. In that October 10, 2024 email to Mayfield, Noland further stated that DSA "incorporated as Democratic Socialists of America in 1982," and that "the earliest record are the articles of incorporation of 1982," which were attached to the October 10, 2024 email. (NYU_000783-84 (Document #46)).

173. DSA's Articles of Incorporation and its Certificate of Incorporation are attached to the October 10, 2024 email from Noland to Mayfield. (NYU_000819–826 (Document #46)).

174. In that October 10, 2024 email, Noland advised that DSA had "reports of the merger in archived copies of the publication Democratic Left" and attached the March 1982 edition (Vol. V, No. 5) of *Moving On: Magazine of the New American Movement* (NYU_000783-84, 787–802 (Document #46)), the March 1982 issue of *Democratic Left* (NYU_000803-818 (Document #46)), and DSA's articles of incorporation (NYU_000819-826 (Document #46)). The March 1982 edition of *Moving On* reflects that the publication thereafter was replaced by *Democratic Left*, "which will be the publication of the Democratic Socialists of America." (NYU_000788 (Document #46)).

175. On October 11, 2024, Mayfield responded, "Thank you Christian. I have sent the documents over to processing who will need to connect with our legal liaison. [¶] In preparation of sending out forms, please let me know who can sign for the organization and where I should be mailing the forms." (DSA_1699 (Document #9)).

176. On October 11, 2024, Noland emailed Mayfield with the requested name and address, and stated, "Please let me know if you need anything else from us." (DSA_1699 (Document #9)).

177. On December 20, 2024, Noland emailed Mayfield, "I just wanted to ask if you had mailed the documents yet." (DSA_1699 (Document #9)).

178. On January 2, 2024, Mayfield responded to Noland, "No forms have been sent. The information you provided was forwarded to the plan sponsor for review. Once we have verification from the plan sponsor of whether the information provided is sufficient or if additional information will be needed, I'll let you know." (DSA_225 (Document #9)).

179. On October 2, 2024, TIAA representative Ana Maria Pereira ("Pereira") emailed Mark Petti, Director of Retirement Plans and Global Benefits for NYU ("Petti"), stating that Plaintiff's counsel had notified TIAA that "they are contesting the beneficiary designation on file with TIAA" and "looking for NYU's permission to place a hold on Dr. David F Greenberg's assets during a beneficiary contestation dispute." (NYU_001092-1093 (Document #11)).

180. In that October 2, 2024 email, Pereira stated that "[t]he most current designation on file for the RA contract A6132193 / P6132190 identifies the participant's parents (Louis Greenberg (father) and Mina Greenberg (mother) as the primary beneficiaries, and the New American Movement as the contingent beneficiary." Pereira further advised that "[t]he GSRA and RP/RS contracts under plan 102192 carried over the beneficiary information from the RA contract." (NYU_001092 (Document #11)).

181. The October 2, 2024 email additionally provides that the GSRA contract under Plan 102192 "was a negative enrollment that carried over the beneficiary information from the RA contract," that "there is no enrollment documentation on file," and that "no subsequent beneficiary

changes were received for any of the accounts after the accounts were established." (NYU001093 (Document #11)).

182. On January 2, 2025, Pereira emailed Petti stating that TIAA had "requested documentation pertaining to the merger and received the attached information from the Democratic Socialist of America," and asked whether the documentation was sufficient "to allow [NYU] to settle the proceeds that was designated to the New American Movement." (NYU_000760–761 (Document #60)).

183. The January 3, 2025 email further states: "Only the articles included with [DSA's] information seem to tie the New American Movement in with their organization and not the Certificate of Incorporation. Without having information regarding the terms of the merger, [TIAA is] unable to conclude that these funds would be due to the Democratic Socialist of America." (NYU_000760–761 (Document #60)).

184. On July 21, 2025, after Plaintiff commenced this action, Petti emailed TIAA representative Jeff Vautier ("Vautier") requesting, among other things, "[c]opies...of all communications between TIAA and David Greenberg...discussing his benefits, annuity contracts, or any other retirement vehicle." (NYU_000778 (Document #60)).

185. On August 12, 2025, TIAA representative Emily Dzimwasha responded on Vautier's behalf, stating that "[TIAA's] National Contact Center and IT have finalized their investigation and found no evidence of a beneficiary discussion [between Greenberg and] TIAA during the past 7 years." (NYU_000776–779 (Document #60)).

**Plaintiff's Administrative Claim**

186. On September 23, 2024, Plaintiff's counsel sent written correspondence to TIAA stating, "We dispute and contest the distribution of Mr. Greenberg's TIAA-CREF 401(k) account

. . . to the account's named beneficiary, New American Movement (a/k/a Democratic Socialists of America)" and requesting that TIAA produce all documents relating to Greenberg's TIAA-CREF account, including "the beneficiary designation form, designating New American Movement as plan beneficiary," the SPD, and correspondence between TIAA and Greenberg regarding his beneficiary designation.

187. On October 23, 2024, TIAA sent a written response to Plaintiff's counsel in which it produced certain documents responsive to the September 23, 2024, request and outlined the procedures for submitting a formal claim for death benefits under the Plan. (NYU_000646-647 (Document #61)).

188. On December 20, 2024, Plaintiff, through counsel, submitted a written claim to NYU (the "Claim") listing the three certificates (A6132193/P6132190, L30977S6/M30977S4, and F1776563/H1776569) and stating, "[T]he Estate hereby provides notice that it is entitled to and makes claim all funds located in the above referenced accounts and any other retirement accounts formerly held by David F. Greenberg which are presently unknown to the Estate." (NYU_000827 (Document #62)).

189. Plaintiff's claim included no supporting evidence or argument.

190. On April 1, 2025, NYU responded to Plaintiff's Claim, stating that, pursuant to "Appendix C [of] the claims and appeals procedures for the New York University Retirement Plan for Members of the Faculty, Professional Research Staff, and Administration," additional time was needed to process the Claim and to determine the status of the entities listed as beneficiaries on the account. (NYU_000828 (Document #62)).

191. No final determination was issued by NYU with respect to Plaintiff's Claim before Plaintiff commenced this action. (Petti Dep. Tr. 11:23–25, 12:2–3 (Document #63)).

Dated: February 25, 2026
   New York, New York

**SCHWARTZ, CONROY & HACK, P.C.**

By:    */s/ Sarah A. McMahon*
       Sarah A. McMahon, Esq.
       Michail Z. Hack, Esq.
       Evan S. Schwartz, Esq.
       666 Old Country Road, 9th Floor
       Garden City, New York 11530
       (516) 745-1122
       sam@schlawpc.com
       mzh@schlawpc.com
       ess@schlawpc.com

       *Attorneys for Plaintiff and Counter-Claim*
       *Defendant Martin Hecht as Administrator of*
       *the Estate of David F. Greenberg*

Dated: February 25, 2026
   San Francisco, California

**RENAKER SCOTT LLP**

By     */s/ Teresa S. Renaker*
       Teresa S. Renaker, *pro hac vice*
       505 Montgomery Street, Suite 1125
       San Francisco, CA 94111
       (415) 653-1733
       teresa@renakerscott.com

       *Attorneys for Defendant, Counter-Claimant,*
       *and Cross-Claimant Democratic Socialists*
       *of America, Inc.*

Dated: February 25, 2026
   Melville, New York

**BOND, SCHOENECK & KING, PLLC**

By:    */s/ Suzanne M. Messer*
       Suzanne M. Messer, Esq.
       Sabrina Salama, Esq.
       68 South Service Road, Suite 400

31

Melville, New York 11747
(631) 761-0800
messers@bsk.com
ssalama@bsk.com

*Attorneys for Defendant and Cross-Claim*
*Defendant New York University*