

## DEMOCRATIC SOCIALISTS of AMERICA

853 Broadway, Suite 801
New York, NY 10003
(212) 260-3270

1300 West Belmont Ave.
Chicago, IL 60657
(312) 871-7700

3202 Adeline St.
Berkeley, CA 94703
(415) 428-1354

**Co-Chairs**
Barbara Ehrenreich
Michael Harrington

**Vice Chairs**
Harry Britt
Ronald Dellums
Dorothy Healey
Irving Howe
Frances Moore Lappe
Manning Marable
Hilda Mason
Marjorie Phyfe
Christine Riddiough
Rosemary Ruether
Edwin Vargas, Jr.
William Winpisinger

**Executive Director**
Maxine Phillips

**Staff**
Carisa Cunningham
Holly Graff
Esmeralda Guerrero
Jeremy Karpatkin
Jonathan Lee
Jim Shoch

## DSA As Organizational Labyrinth:
Everything You Were Afraid To Ask And Are Still Not Sure
You Want To Know

Prepared by Leo Casey, National Executive Committee

### A History of the Current Organizational Structure

At its first meeting following the merger convention
in Detroit, the newly elected National Executive Committee
(NEC) of DSA voted unanimously to adopt a legal organiza-
tional structure which was different from that used by both
of our predecessor organizations. Both NAM and DSOC had
operated as unincorporated membership associations, but
following the advice of our lawyer, the NEC instructed
the then national directors to
1. incorporate DSA as a not for profit corporation;
2. apply to the Internal Revenue Service for recogni-
    tion as a not for profit corporation under section
    501.c.4 of its code (hence, the name 501.c.4);
3. establish a Political Action Committee (PAC)
    for the purpose of endorsing and raising funds
    for candidates for national/federal political
    office, which DSA could not do directly under
    section 501.c.4 of the I.R.S. code.
As a result of these changes, DSA was to assume a legal
structure identical to those used by other, large member-
ship organizations of a progressive or left nature, such
as the National Organization for Women, Americans for
Democratic Action and the various Citizen Action affiliates.
The main component of this structure is the membership
organization itself, incorporated as as a 501.c.4 not for
profit corporation. When we speak of DSA, we are usually
talking about our 501.c.4 incorporation. Affiliated to it,
but without any direct connection to each other (which
would be illegal), are (1) a PAC which bears the same name
as the membership organization (i.e., Democratic Socialists
of America - National Political Action Committee) and (2)
a separate not for profit educational corporation recognized
under section 501.c.3 of the I.R.S. code (i.e., the Insti-
tute for Democratic Socialism and the New American Research
Institute are 501.c.3 corporations.) The two affiliated
bodies perform functions which the 501.c.4 corporation can
not legally do. As mentioned above, the PAC is the vehicle
for endorsing and raising funds for national/federal office,
while the 501.c.3 performs strictly educational (i.e., non-
political in the sense of non-electoral and non-lobbying)
functions.  Because of its restricted educational and not
for profit status, a 501.c.3 is treated in the I.R.S. code
as if it were a charity in that contributions to it may be
deducted from the contributor's federal income tax. Many
wealthy contributors and foundations which act as conduits

82

DSA_00140

DSA As Organizational Labyrinth...............................Page 2

for wealthy contributors will give only to a 501.c.3 corporation, given the resulting tax advantages. In sum, under this new organizational structure three different legal personas would perform the functions previously undertaken by the one unincorporated membership associations.

Why The Change?

Given the seeming (and real) complexity of this new structure, and as I shall show below, the special regulations which DSA-PACs must observe, why adopt this new and more cumbersome arrangement? Let us recall the rationale here, before I enter into the specifics of what locals must know. For purposes of clarity, I shall present them in a point form.

.1.

Neither DSOC nor NAM, nor the two 501.c.3 corporations which loosely operated in their millieus and often contributed to their projects, ever drew any scrutiny from the IRS. But as the time for merger drew near, it became clear that DSA would be a substantially larger organization than either of its predecessors, and that it would be beginning to intervene in the electoral arena on a scale unprecedented by either NAM or DSOC standards. If DSA did not apply to the I.R.S. for recognition under a particular section of the code, the chances were that the I.R.S. would sooner or later open its own investigation of DSA. And if the I.R.S. took the initiative, there is every reason to believe that it would do so as part of a campaign to 'defund' and 'deorganize' the left; they could easily decide that a legally undefined DSA belonged under a section of the code which would be to our disadvantage. The longer we maintained the NAM and DSOC status quo as unincorporated membership organizations with no I.R.S. recognition, the greater the chance that they would move first -- against us.

.2.

Status under any section of the I.R.S. would involve some restrictions on DSA's activity; the old uncomplicated days of DSOC and NAM were gone. The point was to chose that status which would allow us the maximum of benefits and the minimum of problems. The choice was between two options: registration as an unincorporated membership organization qua political committee under section 527 of the I.R.S. code, or registration as a not for profit corporation under section 501.c.4 of the I.R.S. code.

The 527 Option

.3.

On the plus side, the 527 status would allow DSA to endorse candidates for public office without establishing a Political Action Committee, and submitting ourselves to a myriad of regulations described below. But even here Federal Election Campaign law would still require DSA to establish a PAC if we were to provide significant financial support for candidates and campaigns (over $1000. per election from the national and locals).

.4.

Moreover, it was simply unacceptable that DSA register as a political committee and thus continue as an unincorporated membership association. Under this legal status, the officers of DSA could be held legally responsible for the financial debts of DSA and could be named as defendants in law suits against DSA. In short, becoming an officer of DSA would mean assuming financial liabilities which could lead to personal bankruptcy. Incorporation does not completely protect individuals from such suits, but it does make that possibility more unlikely.

DSA_00141

DSA As Organizational Labyrinth..............................Page 3

.5.

As well, a 501.c.3 corporation can not be affiliated to or in any way controlled by a 527 committee. If the I.R.S. were to investigate IDS or NARI, and determine that such a relationship with a 527 commmittee did exist, they would withdraw the 501.c.3 status and thus the ability of IDS or NARI to take tax deductible contributions. Income to IDS or NARI, now in six figures, would for all practical purposes cease; moreover, the I.R.S. could impose penalties for past violations. On the other hand, if IDS and NARI were genuinely independent of DSA, there is no way DSA could control the use and disbursement of their funds. The political leadership of DSA could set one priority and the board of IDS or NARI another. No one could contribute to IDS or NARI with the assurance that the funds would be used according to DSA's priorities.

.6.

Finally, a trade union can not make contributions to a 527 committee from its membership dues; only a trade union affiliated PAC can do so. All trade union income to DSA (and to DSOC and NAM in the past) has come from membership dues income, and thus would not be available to a 527 committee. Since trade union PAC funds must be raised from voluntary contributions from their members and is used for electoral campaigns, it is   likely that they would be unavailable to a DSA organiz ed as a 527 committee.

The 501.c.4 Not for Profit Corporation Option

.7.

As against the 527 committee the 501.c.4 not for profit corporation option had several advantages. First, as a corporation, it provided our officers with some legal protection from financial liability. Secondly, under the I.R.S. code and subsequent judicial interpretations, a 501.c.4 corporation may control a 501.c.3 corporation, thus securing the 501.c.3 status of IDS, NARI or subsequent bodies while still allowing DSA the means to establish democratic control over IDS and NARI funds. Finally, a 501.c.4 corporation may accept trade union income from organization membership dues.

.8.

In addition, a 501.c.4 not for profit corporation is usually accorded a not for profit postal rate  which would save the national and locals tens of thousands a year. (I say "usually" because the regulations of the Post Office are not explicit on this point, and a difficult postmaster is not required to provide this not for profit rate. But it is customary to do so.)

.9.

On the negative side, a 501.c.4 corporation may not endorse a candidate for public office or contribute to his/her campaign. However, it may establish a separate segregated fund Political Action Committee which bears the name of the 501.c.4 corporation, which can endorse candidates for public office, and which can raise funds -- but only from the membership of the 501.c.4 corporation -- from which it can make contributions to electoral campaigns.

Given this array of facts, the National Executive Committee decided on the 501.c.4 not for profit corporation. Currently, our application is still pending because of I.R.S. requests for extensive financial records which have taken some time to gather, but we expect a positive judgment within the year.

How Does This Affect My Local?

Once DSA is given 501.c.4 status, the locals will be notified; all locals which have substantial mailing lists will then be able to

DSA_00142

DSA As Organizational Labyrinth...............................Page 4

apply to their local postmaster for the reduced not for profit rate. This will allow for a significant savings in your regular costs. On the other hand, locals with a large budget (the best guide here is probably $5000. per year in income/expenditures and/or a local staffperson) must keep clear financial records, and supply an annual copy to the Financial Manager for inclusion in the DSA annual report to the I.R.S.

Locals which are engaged in projects of an educational nature, such as socialist schools, should make use of IDS, NARI or their successors in their work. As these first two bodies are already registered with the I.R.S. as 501.c.3 not for profit corporations, their respective boards can sponsor such projects; when so sponsored, these projects would be able to apply for not for profit postal rates, to apply for exemptions from sale taxes, and to obtain public facilities at special low rental rates. As well, contributions to those projects made through IDS or NARI would be tax deductible. There is an economy of scale involved here, and only the larger locals should seriously consider these options. For further information, talk to the Financial Manager.

The most significant change for your local lies in the wonderful world of PACs. Some extensive explanation is required here.

PACs: The Hows and Whys

The first problem in explaining PACs is the legal lack of clarity and imprecision which surrounds them. The current controversy over the use of "independent" delegate PACs in the Mondale campaign is only one example of confusion around what is and is not permissible. While I will offer simple steps for locals below, it is nonetheless important that you begin with an understanding of some of the complexity that surrounds PACs. Under pressure to reform election financing, Congress passed a Federal Election Campaign Act in 1971; in addition to limiting the amount of money any one individual could contribute to a candidate or a campaign ($1000. per candidate per election), the legislation established in law Political Action Committees and a Federal Elections Commission to oversee their activities, as well as election campaigns in general. Since 1971 the act has been amended four times, and various aspects of the legislation has been subject to judicial review. Moreover, the Federal Elections Commission establishes its own set of regulations which, under the "legislative veto", had acquired the status of law; since the Supreme Court declared the "legislative veto" unconstitutional, regulations of Executive Branch commissions are automatically given the status of law. Finally, the Federal Elections Commissions has issued hundreds of "advisory opinions" which are designed to clarify the legislation and regulations, and these "advisory opinions" have a quasi-judicial status; unless appealed to a federal court, they are the standing interpretation. As well, this election code interacts with other sections of the federal code, such as the Internal Revenue Code. Add to this pot-pourri the tendency of courts and the commission to review specific problems and situations in the narrowest terms, and the ambiguities of the law abound. What follows is the attempt of an educated layperson to cut through this thicket and provide clear guidelines for locals; it can not substitute for the advice of a lawyer on particular points of law. The Federal Elections Commission has a toll free number (800-424-9530), and their staff will provide advice and information on particular problems.

The first fact which locals should recognize is that there is a basic division in election legislation between the federal level

DSA As Organizational Labyrinth............................Page 5

and the state/local levels. They are governed by different laws, and organizations such as DSA need to have structurally separate PACs, with separate funds and bank accounts, if they want to operate on both levels. In this memorandum I shall focus only on the DSA-National PAC, and how locals can be involved in electoral work for federal campaigns and candidates (President, Vice-President, Senator, Representative and delegates to national party conventions). Since state/ local PACs are under the jurisdiction of their respective state codes, there is little in the way of useful information which applies across the board; I have included as Appendix 1 to this memorandum a list of the departments in each state government which can be contacted for information on state PACs and their particular legal context. (Note: it is important to be aware of your particular state regulations. As a general rule, federal regulations are more restrictive than federal ones. In Massachusetts, for example, local/state PACs are able to accept dues related income from trade unions, while this is strictly prohibited for federal PACs.) In states where there are more than one DSA local, it would be best to avoid any duplication of effort in establishing local/state PACs; it would certainly make sense to have one local research the requirements for establishing a PAC, and may -- depending upon the state code -- be more efficacious to set up one state-wide PAC with different locals, patterned after the structure of DSA-NPAC.

Local involvement in DSA-NPAC can be simple and uncomplicated, or rather elaborate, depending upon the extent to which your local wants to become involved in the financial and fundraising aspects of federal campaigns. I shall list a number of stages of involvement, beginning with the most simple.

First, the easiest and most straight-forward option for a local is to avoid all financial transactions. If your local simply wants to endorse candidates, notify its membership of its endorsements and provide volunteer campaign workers, all that you need do is follow the procedures outlined in the DSA-NPAC By-Laws, which are included in this memorandum as Appendix 2. The only point to remember here is that DSA proper, because it is a 501.c.4 not for profit corporation, is not the organization engaging in these activities. All endorsements and discussions of possible endorsements, as well as general discussions of electoral strategy, must take place within meetings of DSA-NPAC: advertise such meetings  or portions of meetings as such, and be sure to recess DSA and bring DSA-NPAC to order before these matters are taken up.

Secondly, if you want to involve your local in fundraising there is one general rule which applies to all financial matters. DSA-NPAC is a particular kind of PAC, a "separate segregated fund" PAC; this means that like trade union, corporate and other membership organization PACs, we can only solicit and accept contributions from our own membership. The only PACs which can legally solicit from the general public are those independent of other organizations.

Thirdly, there is a relatively simple method for funnelling contributions from DSA members to endorsed candidates which should meet the needs and strategic objectives of most locals without involving you in complex regulations and reporting procedures. So long as you solicit and accept only "earmarked contributions" -- contributions which are specifically designated for a particular candidate -- most of the regulations and reporting procedures are inapplicable. But clear records that contributions are "earmarked" must be kept, and

DSA_00144

DSA As Organizational Labyrinth.............................Page 6

must be sent to the national office to be included in our report to the Federal Election Commission. The best method for doing so is to use a card such as outlined below:

---

DEMOCRATIC SOCIALISTS OF AMERICA -- NATIONAL POLITICAL ACTION COMMITTEE, SAN FRANCISCO LOCAL

Enclosed is $_____, which is an earmarked campaign contribution for the following DSA-NPAC endorsed candidates:
    For US President -- Maxine Waters ($____.)
    For US Senate -- Harry Britt ($____.)
    For US Representative -- Jim Shoch ($____.)
                        -- Jean Ross ($____.)

Name:_____

Address:_____

_____

Return to: DSA-NPAC, San Francisco Local
           3202 Adeline Street
           Berkeley, California 94703

---

If this card or a xerox copy of it is sent to the national office, it will meet all reporting requirements. Moreover, you need not be concerned with how much you give to particular candidates, as the earmarked contribution is treated by the Federal Election Commission as if it were a contribution directly from the individual to the candidate. However, by channelling contributions which would have been made anyway through DSA PACs, we organize ourselves with respect to candidates Shoch and Ross, making our presence felt and having one more instrument for keeping them honest. One of the strong points of this type of fundraising is that you can encourage members who give already to give in a more politically effective fashion.

Lastly, your local can engage in general fundraising from its membership if it so desires. Such fundraising allows you to give contributions as you desire, and not according to the amounts you receive. It also provides you with a pool of money which you can use for your own campaign work, either as an independent expenditure on behalf of a candidate or against a candidate. But this funding must be raised only from your membership, and can only be spent in accordance within the general limits of the law ($5000. per candidate per election). Since several locals could give to Senate and Presidential candidates, such contributions would have to be coordinated through state committees and the national office; you could not simply give on your own.

Two general points that hold true for all these scenarios should be stressed. First, as a separate segregated fund PAC, DSA-NPAC can receive "administrative" funds; this means that the costs of announcing and organizing DSA-NPAC meetings, as well as communicating DSA-NPAC decisions to the membership, can be born by DSA proper. As well DSA can provide seed money for fundraising from the membership, provided that it is general fundraising, and not for a specific candidate or candidates. However, DSA funds can not be used for any DSA-NPAC activities on behalf or against specific candidates. Secondly, some contributions which DSA locals have traditionally made to candidates are considered to be contributions and must be included

DSA_00145

DSA As Organizational Labyrinth.............................Page 7

in our reports to the Federal Elections Commissions. For example, locals have often given their mailing lists gratis to friendly candidates; this is considered a contribution in kind, and must be listed as such. The cost of the list (i.e., its printing) must be covered by some DSA-NPAC funds which are not administrative contributions from DSA proper.

It is simply impossible to cover all possible situations in a memorandum. For the most part, your local will be engaged in activities which fall within the guidelines listed above. But particular problems and questions will arise: Is it possible to have a fundraising party which goes under "earmarked contributions"? Can DSA local organizers work for a candidate while taking a DSA salary? The answers to these and similiar questions depend upon the particulars: when in doubt, contact the DSA National Office, or myself (212-522-4294); if necessary, the Federal Elections Commission staff can be consulted (800-424-9530). The Commission has held regional conferences which provide intensive workshops on various aspects of PACs and federal elections; locals should consider sending one or two of their members in order to build a cadre skilled and educated on these matters. Information on such conferences can be obtained from the Commission at 1325 K Street, N.W., Washington DC 20463. Finally, the Commission provides a number of free materials which you can obtain (see Appendix 3).

By Way of Conclusion

There is good reason to be troubled by the evolution of PACs and the American electoral system: as should be clear even from this rough sketch I have provided above, it has become more and more difficult for "non-professionals" to be directly involved in electoral politics. While this is a development we would all deplore, and while PAC regulations are bound to be one more burden on an already overburdened activist core in your local, these changes are not ones we can ignore. For better or for worse, activists in electoral politics will have to know how to work in and with PACs.

DSA_00146