UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN HECHT, *as Administrator of the Estate of David F. Greenberg*,<br><br>                                        Plaintiff,<br>               -v-<br><br>NEW YORK UNIVERSITY *and* DEMOCRATIC SOCIALISTS OF AMERICA, INC.,<br><br>                                        Defendants. | 25 Civ. 3042 (PAE)<br><br>OPINION & ORDER |

PAUL A. ENGELMAYER, District Judge:

This case under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, involves competing claims to a more than $5.2 million retirement account left by a New York University ("NYU") sociology professor, David F. Greenberg.  In 1975, Greenberg designated his parents as the beneficiaries of any undistributed funds in his NYU retirement benefits plan, with the leftist New American Movement ("NAM") or "any successor thereof" designated as the contingent beneficiary; if neither NAM nor a successor existed at the time of Greenberg's death, his estate was next in line.  When Greenberg died in 2024, his parents were deceased and NAM was defunct.  A dispute, culminating in this litigation, arose between the Democratic Socialists of America, Inc. ("DSA"), which claims to be NAM's successor, and Greenberg's estate, represented by its administrator, Martin Hecht, Greenberg's nephew.  Each seeks a declaration that they are entitled to Greenberg's retirement account.   Hecht and DSA also bring a claim against NYU, seeking an order to transfer the retirement account accordingly.  As an alternative means to obtain equivalent monetary relief for the estate, Hecht separately sues NYU, for breach of fiduciary duty, claiming that NYU breached a duty by not prompting

Greenberg, years after the initial designation of NAM or its successor as contingent beneficiary, to review and revisit that designation.

Following discovery, the parties now move for summary judgment on their counterclaims and cross-claims.  For the following reasons, the Court (1) grants DSA's motion for summary judgment on its counterclaim for declaratory relief, and denies Hecht's motion for summary judgment on that claim; (2) denies Hecht's motion for summary judgment on his claims for declaratory and related relief, and grants DSA's motion for summary judgment on those claims; (3) grants DSA's motion for summary judgment on its cross-claim against NYU, for an order directing it to distribute Greenberg's retirement account to DSA; and (4) grants NYU's motion for summary judgment on Hecht's claims against it, including for breach of fiduciary duty.

## I.      Background[1]

### A.      The Parties

Between 1973 and 2022, Greenberg was a sociology professor at NYU.  Dkt. 48 ("JSF") ¶¶ 1, 27.  He died on July 12, 2024.  *Id.* ¶ 4.  Hecht is Greenberg's nephew and administrator of his estate.  *Id.* ¶ 6.  DSA is a nonprofit corporation organized under the laws of the District of

---

[1] This decision draws the underlying facts from the parties' submissions in support of and opposition to these motions, including: the parties' joint statement of undisputed facts and exhibits, Dkt. 48 ("JSF"); Hecht's declarations and exhibits, Dkt. 53; DSA's Rule 56.1 statement, declarations, and exhibits, Dkts. 59–62; and NYU's declaration and exhibits, Dkt. 55.

Citations to the JSF or a party's Rule 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Columbia and headquartered in New York City. *Id.* ¶ 8. NYU is a private university organized under the laws of New York. *Id.* ¶ 7. NYU sponsored and was plan administrator of Greenberg's retirement plan. *Id.*

### B.     Greenberg's Career and Writings

Born in 1942, Greenberg attended the University of Chicago, from which he received a B.A. (1962), an M.A. (1963), and a Ph.D. (1969) in physics. *Id.* ¶ 3; Dkt. 48-3 ("NYU Obit.") at 1. While in graduate school, he became increasingly involved in the "social and political movements of that era," including the "anti-prison movement." NYU Obit. at 1. In a 1970 publication, for example, Greenberg wrote: "One of the most difficult and one of the most ignored of our social problems is the problem of prisons—a problem which might be ameliorated through drastic prison reform, but which can be solved only through the abolition of prisons." *Id.* In 1973, he became an assistant professor in NYU's sociology department. *Id.*

Greenberg taught at that department for the next 49 years, until his 2022 retirement. *Id.* During that time, his academic interests included criminology, sexuality, sociology, evolutionary psychology, and mathematical modeling in social sciences. *Id.* at 2. He was "well-known" for "many and varied contributions to Marxist and radical criminology," including writings on "penal sanctions in communist countries," legal theories concerning "Soviet Marxist writer Eugene Pashukanis," and his 1981 book *Crime and Capitalism: Essays in Marxist Criminology*. *Id.*

### C.     NYU's Retirement Plan

Greenberg participated in NYU's retirement plan for faculty (TIAA Plan No. 102192) (the "plan"). JSF ¶¶ 1–2. The plan is governed by ERISA. *Id.* ¶ 10. Retirement benefits to plan participants are funded, in part, through individual retirement annuity contracts, issued to participants by authorized investment providers. *Id.* ¶ 11.

3

The plan contained the following terms:

- Sections 2.11 and 2.12 provide for employer and employee contributions, and apply these contributions toward "Annuity Contracts" or "Custodial Accounts" for the benefit of plan participants and their beneficiaries. *Id.* ¶ 13.

- Section 2.3 defines "Annuity Contract" as "a non-transferable annuity contract . . . selected by [NYU] to which contributions under the Plan may be made and that is issued by an insurance company qualified to issue annuities in a state . . . and that includes payments in the form of an annuity." *Id.* ¶ 14.

- Section 2.3 states that the provisions of each annuity contract are incorporated by reference into the plan, provided they are not inconsistent with the terms of the plan. *Id.* ¶ 17. The plan also states: "To the extent any provision of the Plan is inconsistent with any provision of an Annuity Contract . . . the provision of the Plan will control." *Id.* ¶ 18.

- Section 2.5 defines "Beneficiary" to mean "any person or entity designated by the Participant to receive a benefit from an Annuity Contract . . . on account of the death of the Participant." *Id.* ¶ 19.

- Section 2.7 defines "Custodial Account" as "a custodial account, if any . . . selected by the [NYU] and established pursuant to a Custodial Agreement, to which contributions under the Plan may be made." *Id.* ¶ 15.

- Section 2.8 defines "Custodial Agreement" as "an agreement between a custodian . . . and either a Participant or the University, under which assets of the Plan are held in Custodial Accounts for Participants and invested in shares of regulated investment companies." *Id.* ¶ 16.

- Section 6.3(c) provides: "In the case of a Participant who dies on or after his or her Annuity Starting Date, no benefits will be payable to a surviving spouse or other beneficiary after the Participant's death except to the extent provided in the form or forms of distribution in effect with respect to the Participant pursuant to Section 6.1." *Id.* ¶ 22.

- Section 7.6(a) states: "In the event of a dispute between the Vendor or Administrator and a Participant or Beneficiary over the amount of benefits payable under the Plan," a participant or beneficiary "may file a claim for benefits by notifying the Administrator of such claim." *Id.* ¶ 23. It states that such notification "must be in writing and shall set forth the basis of such claim," and that the Administrator "shall decide whether to grant a claim within 90 days of the date on which the claim is received," unless "special circumstances require a longer period for review." *Id.* In that event, the plan requires that claimant be notified in writing within the initial 90-day period, and that "no extension shall be longer than an additional 90 days beyond the original response deadline." *Id.*

- Section 2.31 defines "Vendor" to include the Teachers Insurance and Annuity Association of America–College Retirement Equities Fund ("TIAA").  *Id.* ¶ 24.

- Section 8.7 provides that the plan "will be construed, administered and enforced according to the laws of the State of New York to the extent not preempted by federal law."  *Id.* ¶ 25.

The summary plan description ("SPD"), under the header "What Laws Govern the Plan?," states:

> The Retirement Plan is governed by current tax and other federal law as well as the rulings of the Internal Revenue Service and the Department of Labor.  The Plan will always be construed to comply with these laws and rulings.  If there are any changes in applicable law or governmental rulings, the Plan will be amended as required to stay in compliance.  You will be kept informed of any changes as may be required by law.

*Id.* ¶ 26.  NYU selected annuity contracts provided by TIAA, and custodial accounts by The Vanguard Group, Inc. ("Vanguard").  *Id.* ¶¶ 20–21.

### D.    Greenberg's Participation in the Retirement Plan

On or about February 25, 1974, Greenberg executed an application for a "TIAA Retirement Annuity Contract / CREF Retirement Unit-Annuity Certificate."  *Id.* ¶ 34 (cleaned up).  Greenberg participated in this retirement plan for the rest of his employment at NYU.  *See id.* ¶ 29.  The 1974 application designated Greenberg's parents as primary beneficiaries.  *Id.* ¶ 55.  It designated NAM as the sole contingent beneficiary, listing for it an address in Minneapolis, Minnesota.  *Id.* ¶ 57.  TIAA issued certificate numbers A6132193 (TIAA retirement annuity certificate) and P6132190 (companion CREF Retirement annuity certificate) (collectively, the "RA contract").  *Id.* ¶ 35.

On or about May 1, 1975, Greenberg amended the RA contract by changing the contingent beneficiary designation to read:

> New American Movement, presently located at
> 1643 N. Milwaukee Ave, Chicago Ill. 60647, or any successor thereof
> If at the death of [Greenberg] said [New American Movement]
> or a successor thereof, is in existence; otherwise to:
> the executors or administrators of [Greenberg].

5

*Id.* ¶¶ 36, 58; Dkt. 48-6 ("1975 Amend.") at 1.  Greenberg never made any further amendments to the beneficiary designations for the RA contract.  JSF ¶ 37.

The RA contract provided that if the participant "die[s] before the Accumulation has been entirely paid out, a death benefit equal to the remaining Accumulation" would be paid to the designated beneficiaries.  *Id.* ¶ 39.  It stated that the certificates issued under it were "made," "delivered," and "to be performed in the State of New York," and that their "validity and effect . . . are governed by the laws" of New York.  *Id.* ¶ 44.

Under the plan, the TIAA also issued to Greenberg a (1) group supplemental retirement annuity contract ("GSRA contract") and (2) retirement choice contract ("RC contract").  *Id.* ¶ 45.  These two contracts follow the beneficiary designations under the RA contract (collectively, the "disputed retirement account").  *Id.* ¶ 59.

On or about December 4, 1996, Greenberg enrolled in NYU's supplemental tax-deferred annuity plan—a separate plan—and opened an account for it (the "Vanguard account").  *Id.* ¶¶ 60–62.  The STDA plan is an ERISA-governed, defined-contribution retirement plan.  *Id.* Greenberg's enrollment form designated Greenberg's two sisters as primary beneficiaries in equal shares.  *Id.* ¶ 63.  The Vanguard account later transferred to TIAA, which remains the STDA plan's recordkeeper.  *Id.* ¶ 64.

### E.    The Historical Relationship Between NAM and DSA

The Court reviews in detail below the relevant history of NAM and DSA, as developed in discovery in this case.  *See* § III(B)(2)(a), *infra*.

In brief, NAM and the Democratic Socialist Organizing Committee ("DSOC") were founded, respectively, in 1971 and 1973, as national democratic socialist associations.  JSF ¶¶ 66–73.  The two associations merged in March 1982 to form DSA.  *See, e.g.*, *id.* ¶¶ 126–36.

DSA's leadership was comprised of former NAM and DSOC leaders; it published leftist periodicals featuring articles by authors formerly affiliated with NAM and DSOC; and it took on the debts and assets of both former associations. *See, e.g.*, *id.* ¶¶ 101–10, 150–51, 158; Dkt. 62-1 ("DSA 56.1") ¶¶ 18–22, 26, 36. DSA's stated mission today accords with those of its predecessors, NAM and DSOC. *See generally* Dkt. 48-14 ("Schwartz, *History of DSA*").

### F.   Greenberg's Membership in and Donations to DSA

DSA's records reflect that David Greenberg "joined DSA" on December 31, 1992—when its electronic recordkeeping began, *see* JSF ¶¶ 163, 167—and that his membership "expired" on March 31, 2025, *i.e.*, the year after his death, Dkt. 48-59 ("DSA Greenberg Records") at 1; *see also* JSF ¶¶ 164–65. Between January 1, 1993 and March 31, 2024, he paid membership dues 29 times, in amounts totaling $1,815. DSA Greenberg Records at 2–4. The records list Greenberg's address as "1306 Sunnyside Ave, Highland Park, IL 60035," which is currently owned by the "Martin P. Hecht Revocable Trust." *Id.* at 2; JSF ¶ 164. The records also list a phone number for Greenberg that begins "212," the area code for Manhattan. DSA Greenberg Records at 2.[2]

### G.   Greenberg's Retirement from NYU, Distribution of His Retirement Benefits, and Death

In 2022, Greenberg retired from NYU. JSF ¶ 30. At that time, he was fully vested in the benefits under his retirement plan. *Id.* He remained a plan participant and began receiving required minimum distributions. *Id.* ¶¶ 31–32.

---

[2] At argument, the parties agreed that the David Greenberg who was a member of DSA is the same David Greenberg whose retirement account is at issue here.

On July 12, 2024, Greenberg died intestate.  *Id.* ¶ 4.  He was unmarried and had no children.  *Id.* ¶ 5.  His parents and both sisters had predeceased him.  *Id.* ¶ 56; NYU Obit. at 4.  He was survived only by his nephews, including Hecht, and a brother-in-law.  NYU Obit. at 4.

As of June 30, 2025, the balance in Greenberg's retirement plan account was $5,283,120.65.  *Id.* ¶ 33.  As of October 2024, the balance in the separate Vanguard account was $1,343,631.22.  TIAA distributed the proceeds of the Vanguard account to the estate; that disposition has not been challenged.  *See* DSA 56.1 ¶ 1.

**H.      NYU's Administration of the Plan After Greenberg's Death**

On September 23, 2024, TIAA representative Arlene Mayfield—seeking documentation that DSA was NAM's successor—emailed a DSA employee, stating that "New American Movement is a beneficiary on some accounts here at TIAA," and requested a merger certificate.  JSF ¶ 169.  The same day, Hecht's counsel wrote TIAA, arguing that it would be improper to distribute the retirement account proceeds to DSA under Greenberg's beneficiary designation to NAM, and requesting all documents related to that account.  *Id.* ¶ 186.

On October 2, 2024, another TIAA representative, Ana Maria Pereira, emailed NYU's director of retirement plans and global benefits, Mark Petti.  *Id.* ¶ 179.  She noted that the most current beneficiary designation on file for the disputed retirement account listed Greenberg's deceased parents as primary beneficiaries, and NAM as the contingent beneficiary; that Hecht, through counsel, had notified TIAA that he was "contesting the beneficiary designation on file with TIAA"; and that TIAA sought "NYU's permission to place a hold on [Greenberg's] assets during a beneficiary contestation dispute."  *Id.* ¶¶ 179–81.  That day, Petti directed TIAA to place a hold on Greenberg's assets.  Dkt. 48-60 ("TIAA-NYU Emails") at 3.

8

On October 10, 2024, DSA's finance director, Christian Noland, responded to Mayfield's September 23 email. He explained that NAM had merged with DSOC before DSA filed its articles of incorporation (which were attached); that DSA could not "find an online record of the merger"; but that DSA had located reports of the merger in archived copies of publications. He attached the March 1982 issues of *Democratic Left* and *Moving On*. *Id.* ¶¶ 171–74. The latter publication read: "This is the last issue of *Moving On*. On March 20 [1982], NAM and [DSOC] are merging. By early April you will receive your first issue of *Democratic Left* which will be the publication of the Democratic Socialists of America." *Id.*; Dkt. 48-46 ("Mar. 1982 *Moving On*") at 6.

On October 11, 2024, TIAA's Mayfield emailed DSA's Noland by email, confirming receipt of the documents Noland had sent and stating that TIAA would consult with "our legal liaison." JSF ¶ 175. In anticipation of later sending beneficiary forms to DSA, Mayfield asked Noland for the name of a person who "can sign for the organization" and the address to which the forms should be mailed. *Id.* Noland provided the requested name and address. *Id.* ¶ 176. On December 20, 2024, Noland asked Mayfield for an update. *Id.* ¶ 177. On January 2, 2025, Mayfield responded that she had not sent beneficiary forms to DSA because the "plan sponsor" was still reviewing the information DSA had provided. *Id.* ¶ 178.

The same day, TIAA's Pereira emailed NYU's Petti, attaching the materials that DSA had sent, and seeking Petti's views on whether it was "sufficient to allow [NYU] to settle the proceeds that [were] designated to the New American Movement." TIAA-NYU Emails at 1–2. Pereira stated: "Only the articles included with their information seem to tie the New American Movement in with their organization and not the Certificate of Incorporation. Without having

information regarding the terms of the merger, we are unable to conclude that these funds would be due to the Democratic Socialists of America." *Id.*

On October 23, 2024, TIAA responded to Hecht's counsel, attaching documents that counsel had requested on September 23, and outlining the procedures for submitting a formal claim under the plan.  JSF ¶ 187.  On December 20, 2024, Hecht's counsel submitted a written claim to NYU, on behalf of the estate, for the disputed retirement account.  *Id.* ¶ 188.  It did not include any evidentiary material.  *Id.* ¶ 189.

On April 1, 2025, NYU responded to Hecht's claim, stating that it needed additional time to process the claim and determine the status of the entities listed as beneficiaries.  *Id.* ¶ 190.

On April 11, 2025, Hecht initiated this lawsuit.  *See* Dkt. 1.

On July 21, 2025, Petti emailed another TIAA representative, requesting, *inter alia*, "all communications between TIAA and [Greenberg] or someone from [his] estate . . . discussing his benefits, annuity contracts, or any other retirement vehicle and the distribution of [his] retirement benefits."  *Id.* ¶ 184.  On August 12, 2025, a different TIAA representative responded to Petti:

> [TIAA's] National Contact Center and IT have finalized their investigation and found no evidence of a beneficiary discussion [between Greenberg and] TIAA during the past 7 years[.]
>
> He did however meet with a [TIAA] consultant in November 2022[,] who left the below notes:
>
> 11/07/2022 notes – Dr. Greenberg was verified by his [date of birth].  Dr. Greenberg has been a sociology prof for 49 yrs. . . . We discussed investment options to his current plans, why rollover his IRA, beneficiary [sic] and how to request a beneficiary."

TIAA-NYU Emails at 18.

NYU has not made a determination with respect to Hecht's claim.  *Id.* ¶ 191.

### I.     This Litigation

On April 11, 2025, Hecht initiated this ERISA action.  Dkt. 1 ("Compl.").  His claims are (1) for declaratory relief, principally to the effect that DSA is not a legal successor to NAM or a proper beneficiary of the disputed retirement account; (2) against NYU, for benefits under the retirement plan and to have Greenberg's "true intentions honored"; (3) against NYU, for breach of fiduciary duty, by failing to confirm with Greenberg that the "beneficiary information" on his account "was up-to-date and reflective of [his] true intentions"; and (4) in the alternative, for NYU to pay "all sums that should have been paid" to the estate, as "equitable relief at common law."  Dkt. 1.

On June 6, 2025, DSA filed (1) a counterclaim against Hecht, under ERISA, seeking a declaration that it, not Hecht, was the proper beneficiary of the disputed retirement account; and (2) a cross-claim against NYU, seeking an order directing it to distribute such benefits to DSA. Dkt. 21 ("DSA Answer") at 22–23.

Between June 30 and December 5, 2025, the parties took discovery pursuant to a case management plan.  Dkts. 27 ("CMP"), 32.  A principal focus of discovery was on whether DSA was successor to NAM within the meaning of Greenberg's designation.

On February 25, 2026, after a pre-motion conference, *see* Dkt. 47, the parties filed the JSF and exhibits.  Dkt. 48.  On March 18, 2026, Hecht moved for summary judgment against DSA, Dkt. 52 ("Hecht Mem."), attaching a declaration and exhibits, Dkt. 53.  On April 8, 2026, NYU moved for summary judgment against Hecht, Dkt. 56 ("NYU Mem."), attaching a declaration and exhibits, Dkt. 55.  The same day, DSA opposed Hecht's motion and cross-moved for summary judgment against both Hecht and NYU, Dkt. 58 ("DSA Mem."), attaching declarations and exhibits, Dkts. 59–61, and a Rule 56.1 statement, Dkt. 62-1 ("DSA 56.1").  On

11

April 29, 2026, Hecht opposed DSA's motion as to him.  Dkt. 65 ("Hecht Opp'n to DSA").  On

May 6, 2026, Hecht opposed NYU's motion.  Dkt. 66 ("Hecht Opp'n to NYU").  On May 13,

2026, DSA replied as to Hecht's motion.  Dkt. 69 ("DSA Reply").  On May 29, 2026, NYU

replied as to its motion against Hecht.  Dkt. 71 ("NYU Reply").  NYU did not oppose DSA's

motion as to it.  On July 7 and 14, 2026, DSA filed notices of supplemental authority.  Dkts. 72–

73.

On July 21, 2026, the Court held argument.

## II.    Applicable Legal Standards

### A.    Summary Judgment

To prevail on a motion for summary judgment, the movant bears the burden of

"show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322–23 (1986).  "A dispute about a 'genuine issue' exists for summary judgment purposes where

the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v.*

*County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  In making this determination, the Court

must view all facts "in the light most favorable" to the non-moving party, *Holcomb v. Iona Coll.*,

521 F.3d 130, 132 (2d Cir. 2008), resolving "all ambiguities" in its favor, *Johnson v. Killian*, 680

F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will

preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).

"[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the

moving party to point to an absence of evidence to support an essential element of the

nonmoving party's claim." *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

### B.      Review of ERISA Claims

Where a plan administrator has not complied with the deadline to adjudicate a claim to ERISA benefits, a court reviews that claim *de novo*, subject to certain exceptions not applicable here. *See Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 57–58 (2d Cir. 2016); *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2d Cir. 2005); *Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 243–44 (2d Cir. 2007).

## III.    Discussion

The parties' summary judgment motions fall into two categories.

First, Hecht and DSA cross-move for summary judgment as to which of them is entitled to Greenberg's retirement account.  These motions stand to resolve Hecht's first and second claims.  This issue turns on whether DSA qualifies, under Greenberg's beneficiary designation, as a "successor" to NAM.  Hecht argues that that term—which Greenberg's designation did not define—should be construed to require that DSA acquired NAM's rights through a formal succession mechanism (such as a statutory merger, novation, or legal conveyance).  Hecht

13

contends that these did not occur, and that, with NAM defunct and there not being a successor, the retirement account belongs to Greenberg's estate. DSA counters that, under ERISA case law, the term "successor" is to be given its ordinary meaning, and that the evidence adduced in discovery established that DSA was NAM's successor, based on its historical, organizational, and ideological continuity with NAM. DSA alternatively argues that, even if a more formal legal definition of "successor" were to apply, it meets that definition, too.

Second, NYU moves for summary judgment against Hecht, on his second and third claims that NYU breached its fiduciary duties to Greenberg as plan administrator, and on his fourth claim for equitable relief under common law. NYU argues that ERISA did not require it to prompt Greenberg to clarify or update his beneficiary designations, or to infer—from his 1996 designation of his sisters as the beneficiaries of the separate Vanguard account he then opened— that Greenberg might no longer have intended to leave his retirement account to NAM (or a successor) ahead of his estate. Hecht does not cross-move on these claims. He argues, however, that material factual disputes preclude entry of summary judgment.

### A.    Whether Hecht Exhausted His Administrative Remedies Under the Plan

At the threshold, the Court addresses whether Hecht, before bringing suit, exhausted his administrative remedies.

The Second Circuit has recognized the "firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases" before a plaintiff may sue. *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) (quoting *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993)). Where a plan administrator does not comply with regulatory or plan deadlines, however, a plaintiff is deemed to have exhausted

14

his administrative remedies. *See McQuillin v. Hartford Life & Accident Ins. Co.*, 36 F.4th 416, 419 (2d Cir. 2022); *Nichols*, 406 F.3d at 107.

The parties here agree that Hecht adequately exhausted his administrative remedies before filing this lawsuit. On December 20, 2024, through counsel, he submitted a written claim as to the disputed retirement account. JSF ¶ 188. That satisfied the plan's claim requirements. *See* Dkt. 48-2, App'x C ¶¶ 1, 3. Section 7.6(a) of the plan required NYU to adjudicate claims within 90 days of receipt, unless special circumstances required more time *and* NYU notified the claimant of the need for such extension within the initial 90-day period. JSF ¶ 23; *see also* 29 C.F.R. § 2560.503-1(f)(1). On April 1, 2025—102 days after Hecht's claim—NYU responded to him, stating that it needed additional time to research the claim. JSF ¶ 190. As all agree, the 90-day period for a decision had not been tolled on any ground. NYU's after-the-fact attempt to extend the 90-day deadline was therefore untimely.[3]

The Court accordingly finds that Hecht exhausted his administrative remedies under the plan before bringing this lawsuit. *See, e.g.*, *McQuillin*, 36 F.4th at 419 (administrative remedies exhausted, where plaintiff sued one day after insurance provider's deadline to render decision or notify him of extension); *Nichols*, 406 F.3d at 107 (similar).

> **B.**    **Hecht and DSA's Cross-Motions for Summary Judgment on the Declaratory Judgment Claims: Whether DSA Is NAM's "Successor" Within the Meaning of Greenberg's Contingent Beneficiary Designation**

The parties disagree on how to construe the term "successor," as used by Greenberg in his contingent beneficiary designation.

---

[3] For the same reason, the Court decides *de novo* Hecht's claim to be proper beneficiary. *See Halo*, 819 F.3d at 57–58. The parties agree that a *de novo* determination of that issue is appropriate and that, with the filing of this lawsuit, it was proper for the plan administrator, NYU, to stand down from researching or making its own determination on that issue. *See, e.g.*, Oral Arg. Tr. at 13, 15, 64; Compl. ¶¶ 67–68; DSA Opp'n at 10; NYU Reply at 4.

Hecht argues that that term should be read to import corporate law formalities, and to refer to "an entity that acquires another's legal rights, obligations, or juridical position through a recognized mechanism of succession." Hecht Opp'n to DSA at 4. He argues that, under New York choice of law, Illinois law governs NAM's capacity to transfer property rights to DSA, and District of Columbia law governs whether DSA is NAM's successor-in-interest. Hecht Mem. at 5–6, 15–18. As recounted in detail below, the evidence is overwhelming and undisputed that NAM and DSOC entered into a merger agreement in connection with DSA's formation in 1982. Nonetheless, Hecht argues, owing to asserted noncompliance with the formalities of the above state laws, DSA is not NAM's successor. DSA counters that, under familiar principles governing ERISA, the term "successor" in Greenberg's designation takes its "plain and ordinary" meaning. DSA Opp'n at 1–2, 11. It argues that, by this measure, DSA clearly succeeded NAM.

### 1. The Appropriate Definition of "Successor," as Used in Greenberg's Designation

An ERISA plan is construed according to federal common law. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989); *Aramony v. United Way of Am.*, 254 F.3d 403, 411–12 (2d Cir. 2001). Courts "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience." *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004). Courts "review the Plan as a whole, giving terms their plain meanings," *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002), and using "ordinary principles of contract law," *M&G Polymers USA v. Tackett*, 574 U.S. 427, 435 (2015). Under the "plan documents rule," administrators and reviewing courts must honor beneficiary designations made in accordance with governing plan documents, without regard for evidence extrinsic to the plan. *See Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285,

299–304 (2009); *see also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (ERISA "is built around reliance on the face of written plan documents").

Greenberg's designation (and, the parties agree, the rest of the plan) did not define the term "successor." Greenberg did not use any qualifying language, such as "legal successor," "successor in interest," or "statutory successor." Nothing elsewhere in the designation or plan suggests that Greenberg intended the term to take on a specialized meaning.

In like circumstances, the Second Circuit and courts in this District have interpreted undefined terms in ERISA plans according to their plain meaning. They have rejected narrower definitions drawn from technical or specialized contexts. *See, e.g.*, *Critchlow*, 378 F.3d at 256, 259 (interpreting ERISA plan's undefined reference to "intentionally self-inflicted injury" in "an ordinary and popular sense as would a person of average intelligence and experience"); *Galli v. PricewaterhouseCoopers LLP*, No. 19 Civ. 7224, 2020 WL 4605240, at *9 (S.D.N.Y. Aug. 11, 2020) ("The Plan does not define notice, and the word 'notice' by its plain meaning is not restricted to written notice."); *Mauer v. Nat'l Basketball Ass'n*, No. 23 Civ. 4937, 2024 WL 1116848, at *4 (S.D.N.Y. Mar. 13, 2024) (same as to "termination of employment," citing Black's Law Dictionary and Merriam-Webster, and rejecting added requirement that termination be "irrevocable"), *aff'd sub nom. Mauer v. Pension Comm. of Nat'l Basketball Ass'n Referees' Pension Plan*, 2025 WL 559107 (2d Cir. Feb. 20, 2025) (summary order); *Rappaport v. Guardian Life Ins. Co. of Am.*, 782 F. Supp. 3d 109, 119–21 (S.D.N.Y. 2025) (using Black's Law Dictionary and Merriam-Webster to define "earnings," "bonuses," and "commissions," and rejecting narrower definitions from specialized legal contexts).[4]

---

[4] Other circuits are in accord. *See, e.g.*, *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818–19 (5th Cir. 1997) (interpreting "overtime" and "any other extra compensation" in ERISA plan according to their plain, ordinary meanings, and noting that employer could have, but did not,

Because the designation is interpreted pursuant to the plan, *see Kennedy*, 555 U.S. at 304, the terms used in it likewise are given their "plain meaning" in an "ordinary and popular sense," *Critchlow*, 378 F.3d at 256; *Fay*, 287 F.3d at 104. The Court here has considered the authorities to which courts have looked in construing terms in ERISA plans to discern such meaning of "successor." According to Black's Law Dictionary, a successor is one who "succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor." *Black's Law Dictionary* (12th ed. 2024). Other such authorities are in accord. *See, e.g.*, Merriam-Webster Unabridged ("one that follows"); Oxford Dictionaries ("a person or thing that succeeds another," *i.e.*, that which "comes after and takes the place of" (cleaned up)); Oxford English Dictionary ("[s]omething that follows or replaces something else, often in the same role").

Hecht's numerous counterarguments are unavailing.

First, he argues that the term "successor" necessarily "denotes a legal relationship by which one entity succeeds to the status, rights, or position of another through a recognized juridical mechanism." Hecht Opp'n to DSA at 26–27. He cites various cases as ostensibly supporting that "successor" has an "established legal meaning." *Id.* at 9–11. But neither Black's nor the above dictionaries define "successor" as requiring the succession to have been achieved through a "recognized juridical mechanism." And in common parlance, the term "successor" does not inherently require such. Succeeding an incumbent in a job—whether as a college dean,

---

use more specific or specialized language); *Adams v. Anheuser-Busch Cos.*, 758 F.3d 743, 747–48 (6th Cir. 2014) (interpreting "involuntarily terminated" in ERISA plan under its "plain meaning in an ordinary and popular sense," citing dictionary definitions); *Brewer v. Protexall, Inc.*, 50 F.3d 453, 457–58 (7th Cir. 1995) (same as to "comparable coverage"); *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125, 1129–30 (9th Cir. 2002) (same as to "suicide" and "intentionally self-inflicted injury").

18

a baseball manager, a law clerk, or a parking attendant—would not ordinarily require any such formalities.  And the ERISA case law is in accord, in that it eschews formalism in favor of plain and common meanings, even where a term may separately be a legal term of art.  *See Critchlow*, 378 F.3d at 256, 259 ("intentionally self-inflicted injury"); *Galli*, 2020 WL 4605240, at \*9 ("notice"); *Mauer*, 2024 WL 1116848, at \*4 ("termination of employment"); *Rappaport*, 782 F. Supp. 3d at 119–21 ("earnings," "bonuses," and "commissions").  And the cases Hecht cites are all easily distinguished, including because none involved ERISA plan administration.[5] Dispositive here, the Second Circuit has held that, in interpreting ERISA plans, courts faced with undefined terms look to their "ordinary and popular" meaning.  *Critchlow*, 378 F.3d at 256; *see also Fay*, 287 F.3d at 104.

Second, Hecht argues that "succession" should be interpreted under an amalgam of New York, Illinois, and District of Columbia law.  Hecht Mem. at 8–18.  But that approach is foreclosed by the text of ERISA, apposite case law under ERISA, and the terms of Greenberg's plan.  ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to

---

[5] *See, e.g.*, *Howard Johnson Co. v. Detroit Loc. Joint Exec. Bd.*, 417 U.S. 249, 250–51 (1974) (under Labor Management Relations Act, "successor" employer not compelled to arbitrate claims of predecessor's employees pursuant to collective bargaining agreement); *Leveraged Innovations, LLC v. Nasdaq OMX Grp.*, No. 11 Civ. 3203, 2012 WL 1506524, at \*5 (S.D.N.Y. Apr. 20, 2012) (interpreting "successor" in patent-related settlement agreement); *Bradley v. United States*, 410 U.S. 605, 608–09 (1973) (interpreting "prosecution" in federal statute); *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617–19 (2d Cir. 2001) (federal case law dictated meaning of contractual term "trademarked slogan," because that definition was "sufficiently well-established that it has been taken as a given by the vast majority of federal courts"); *Crescent Beach Club LLC v. Indian Harbor Ins. Co.*, 468 F. Supp. 3d 515, 544 (E.D.N.Y. 2020) (parties agreed that state law could resolve "potential ambiguity" in insurance contract); *Union Mut. Fire Ins. Co. v. 259 Rogers LLC*, No. 23 Civ. 1288, 2025 WL 3755600, at \*10 (E.D.N.Y. Sept. 23, 2025) ("state law or an established custom may fill in the gaps left by the drafters" of insurance contract (cleaned up)); *In re Caldor, Inc.*, 204 B.R. 855, 858 (Bankr. S.D.N.Y. 1997) (citing multiple dictionary definitions to decide whether lease required landlord to repair roof).

any employee benefit plan." 29 U.S.C. § 1144(a).[6] State law is thus preempted insofar as it has any "connection with" benefit plans. *Egelhoff v. Egelhoff*, 532 U.S. 141, 148–50 (2001) (state law cannot void beneficiary designation). Such preemption applies where, as here, state law affects the "determination of eligibility for benefits." *Gerosa v. Savasta & Co.*, 329 F.3d 317, 324 (2d Cir. 2003). ERISA thus precludes recourse to state law to define "successor" as used in Greenberg's designation. *See id.* And the plan is in accord. It states that it shall be "construed, administered and enforced according to the laws of the State of New York *to the extent not preempted by federal law*." JSF ¶ 25 (emphasis added).

The Supreme Court, in fact, has counseled against precisely the interpretive approach urged by Hecht, warning: "Requiring ERISA administrators to master the relevant laws of States and to contend with litigation would undermine the congressional goal of minimizing the administrative and financial burdens on plan administrators—burdens ultimately borne by the beneficiaries." *Egelhoff*, 532 U.S. at 149–50 (cleaned up); *see also Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 16 (2d Cir. 1993) ("It would be counterproductive to compel the [plan] administrator to look beyond [beneficiary] designations into varying state laws regarding wills, trusts, and estates, or domestic relations to determine the proper beneficiaries of [plan] distributions."). The proper application of Greenberg's beneficiary designation—which, but for this lawsuit, would have been decided in the first instance by the plan administrator—does not require consideration of a multi-jurisdictional thicket of state law. It requires application of the

---

[6] The Supreme Court has noted that one of ERISA's congressional sponsors "described the reservation to Federal authority of the sole power to regulate the field of employee benefit plans as ERISA's crowning achievement." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987) (cleaned up).

20

common understanding of the term "successor," as derived from Black's Law Dictionary and the like sources above.

Third, Hecht makes a policy argument.  He asserts that "[l]imiting successor status to legally cognizable mechanisms of transfer" would be more workable than requiring plan administrators to "resolve contested narratives concerning institutional continuity."  Hecht Mem. at 28.  That is wrong.  Notwithstanding the unusual facts of this case, there is nothing unusual about requiring a plan administrator, under ERISA, to ascertain facts.  Plan administrators are commonly called upon to do so and then to apply plan provisions to those facts.  Their findings must be supported by "substantial evidence."  *See, e.g.*, *Pagan v. NYNEX Pen. Plan*, 52 F.3d 438, 441–42 (2d Cir. 1995); *see also Kennedy*, 989 F.2d at 594 (exhaustion requirement facilitates robust development of administrative record).  Indeed, an administrator's failure to adequately investigate facts can warrant reversal.  *See, e.g.*, *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 136 (2d Cir. 2008) (benefit denial unreasonable, where "further investigation [by administrator] was required").  And Hecht's policy argument is a mismatch for the situation here.  As reviewed below, the facts concerning DSA's relationship to NAM are not in dispute, and using the common meaning of the term "successor" clearly compels a finding that DSA is NAM's successor.  It is *Hecht's* approach—requiring the consideration and application of the legal regimes of potentially multiple states—that would introduce complexity to this exercise.

Fourth, Hecht argues that, to be held NAM's successor, DSA must show that NAM formally transferred its interests in Greenberg's retirement benefits, such as through a "legally operative conveyance."  That is wrong for two reasons.  First, Greenberg's designation awards the benefits to "any successor" of NAM.  It does not require the benefits themselves to have passed between NAM and its successor.  And insofar as Greenberg was still alive at the time

21

DSA came to exist—as were his parents, whom he designated as first-order beneficiaries—a requirement that NAM had held the benefits at the time it gave way to a successor would not have made sense.  Second, ERISA requires that plans subject to it forbid assignment or alienation, *see* 29 U.S.C. § 1056(d)(1), which Greenberg's plan does, Plan § 8.3 ("Benefits under the Plan may not be assigned or alienated.").  A "legally operative conveyance" is, under these circumstances, an oxymoron.  The plan cannot be construed to require that legal contradiction. *See Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 596 n.9 (2d Cir. 2007) (courts avoid interpretations leading to "absurd results").

Fifth, Hecht argues that the definition of "successor corporation"—as opposed to "successor"—from Black's Law Dictionary should control.  That argument is wrong, because Black's definition of that term is inapt.  Black's defines "successor corporation" as a "corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation."  But Greenberg did not use the term "successor corporation."  He used the term "successor," without any qualifiers.  "Courts may not by construction add or excise terms . . . under the guise of interpreting" a contract.  *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 125 (2d Cir. 2011) (cleaned up); *see, e.g.*, *N.Y. State Nurses Ass'n Benefits Fund Through Buchanan v. Nyack Hosp.*, 46 F.4th 97, 107 (2d Cir. 2022) (in ERISA case, "parties could have chosen [limiting language, but] chose not to do so, and it is not within the province of the Court to rewrite their agreement for them"); *Galli*, 2020 WL 4605240, at *9 ("The Plan does not define notice, and the word 'notice' by its plain meaning is not restricted to written notice.").  And Black's "successor corporation" definition does not factually fit here, because it requires the predecessor to have also been a corporation ("vested with the rights and duties of an *earlier corporation*" (emphasis added)), but

22

it is undisputed that NAM "never incorporated" and instead "operated as an unincorporated association."  JSF ¶ 67.

### 2. Application of the Term "Successor" to NAM and DSA

The Court now applies the dictionary definitions of "successor" to the question whether DSA is NAM's successor, based on the record developed in discovery.  In other words, did DSA "succeed to the office, rights, responsibilities, or place of" NAM," or "replace or follow" NAM, *Black's Law Dictionary* (12th ed. 2024) (cleaned up); "follow" NAM, *Merriam-Webster Unabridged*; or "come after and take the place of" NAM, *Oxford Dictionaries* (cleaned up)?

The answer is emphatically yes.  The assembled record overwhelmingly reflects that, in every ordinary and functional sense, DSA is NAM's successor.  Indeed, at argument, Hecht's counsel conceded that DSA fit within the colloquial meaning of the term.  Oral Arg. Tr. at 11.  The history of the two organizations, which follows, does not leave any evidentiary basis on which a reasonable finder of fact could conclude otherwise.

#### a. NAM and DSOC's Merger to Create DSA

***1971–1973: NAM and DSOC are founded***.  NAM was founded in 1971 as a national democratic socialist organization.  JSF ¶¶ 66–70.  It functioned as an unincorporated association. *Id.* ¶ 67.  It operated under a constitution and bylaws, which set forth NAM's membership rules, chapter rules, annual convention procedures, referendum procedures, leadership structure, and constitutional amendment procedures.  *Id.* ¶ 68.  NAM's constitution required its leadership to consist of (1) the expanded national interim committee ("E-NIC"), which included members of its national interim committee ("NIC") plus regional representatives; (2) the NIC; and (3) the political committee (the "Committee"), a "full-time paid national leadership body."  *Id.* ¶ 69.  NAM published a bi-monthly magazine, *Moving On*, and a thrice-yearly *Discussion Bulletin* of

essays and other materials. *Id.* ¶ 70. Between 1973 and 1975, its national office moved from Minneapolis to Chicago. Dkt. 62-1 ("DSA 56.1") ¶ 2.

DSOC was founded in 1973. JSF ¶¶ 71–80. It operated as an unincorporated association. *Id.* ¶ 73. It published the monthly *Newsletter of the Democratic Left*, later called *Democratic Left*, maintained a national board, and held national conventions. *Id.* ¶¶ 72, 80. It had a larger membership than NAM's. DSA 56.1 ¶ 3.

Both organizations drew income from membership dues, donations, publication subscriptions and advertising, literature sales, conferences, and other events. JSF ¶ 115.

***1978–1982: NAM and DSOC pursue and complete merger negotiations***. In July 1978, Harry Boyte, a NAM founder and longstanding national leader of the group, published an article in *Socialist Review* urging NAM and DSOC to merge. *Id.* ¶ 81. In March 1979, *Democratic Left* reported that a committee had been appointed at DSOC's biennial convention to "explore merger possibilities with the 800-member [NAM]." *Id.* ¶ 82. At NAM's August 1979 convention, NAM "responded positively to an initiative from [DSOC] for exploration of common concerns," according to the October-November 1979 issue of *Moving On*. *Id.* ¶ 84. At the August 1980 NAM convention, a resolution to enter into negotiations with DSOC regarding the possible merger passed 404 to 208, and directed an eight-member negotiating committee to be elected and "begin negotiations with DSOC as soon as possible." *Id.* ¶ 85.

Although "only about 15 percent of both organizations' active members [] set up opposition caucuses" to the merger, "negotiations still took three years to complete," according to a 1983 article. *Id.* ¶ 83. The merger negotiations were "well known to the NAM membership," and "always contemplated that the merged organization would be a continuation" of both predecessors. DSA 56.1 ¶¶ 6, 17.

24

The March 1981 issue of *Democratic Left* stated that DSOC's National Board had authorized "negotiations and discussion between DSOC and NAM," and instructed a negotiating committee to meet with NAM's corresponding committee to address "political principles and organizational procedures of unification." JSF ¶ 90. The May-June 1981 issue of *Moving On* reported:

> NAM and [DSOC] have been engaged in formal merger negotiations the past few months. On April 4–5 the Negotiating Committees met in New York City and reached a political agreement for the unification of NAM and DSOC acceptable to a large majority of both Committees. This political agreement will be voted on at the DSOC Convention in May and the NAM convention in July. If both Conventions approve this agreement, NAM and DSOC will engage in final negotiations on structural matters in the Fall and look forward to a unity Convention next spring.

*Id.* ¶ 88.

During the merger negotiations, representatives from NAM and DSOC operated with the understanding that the new organization would take on the debts and assets of both predecessor organizations. DSA 56.1 ¶¶ 18–19. They discovered that DSOC and NAM had approximately $95,000 and $5,000 in debt, respectively. *Id.* ¶ 20. The representatives constructed a budget for the new organization that accounted for these debts. *Id.* ¶ 22.

At DSOC's May 1981 convention, a resolution authorizing "final negotiations toward merger with NAM" was adopted with no nay votes, according to the June 1981 issue of *Democratic Left*. JSF ¶ 92. The same issue reported that the local Milwaukee chapters of NAM and DSOC had formed a "combined DSOC-NAM organization." *Id.* ¶ 93. *Moving On* reported that NAM and DSOC members had organized a joint Southern conference in Tennessee. *Id.* ¶ 94.

On August 1, 1981, at NAM's July-August convention, NAM members voted "448 to 59 in favor of merger with DSOC, and in support of the political principles of unity developed by

25

the joint NAM/DSOC Negotiating Committee.  For most, the mood after the vote was one of jubilation—members rose to their feet in applause."  *Id.* ¶ 98 (quoting the September-October 1981 issue of *Moving On*).[7]  In October and November 1981, NAM's NIC and E-NIC passed resolutions concerning the NAM/DSOC negotiations.  *Id.* ¶ 99–100.  During the negotiations, NAM's *Discussion Bulletin* had published more than 60 articles concerning the merger, according to the September-October 1981 issue of *Moving On*.  *Id.* ¶ 125.  NAM published other materials in 1981 that "reference its anticipated dissolution in connection with its combination with DSOC."  *Id.* ¶ 137.

On November 21 and 22, 1981, NAM and DSOC's negotiating committees "successfully concluded negotiations to unify the two organizations" and entered into a formal, 18-page merger agreement.  *See id.* ¶¶ 101–02.  The agreement—which was "subject to the internal ratification processes of each organization"—called for a "unity" convention to be held in Detroit in March 1982.  *Id.* ¶ 102.  The agreement stated that it, along with an attached constitution for the merged organization, outline of its bylaws, and "Points of Political Agreement," had been "jointly agreed to by duly elected negotiating committees of the two organizations."  *Id.* ¶ 102.  The agreement left the unified organization's name blank.  *Id.* ¶ 104.  It also set forth a "transition strategy" "to build upon the established political recognition of both organizations."  *Id.* ¶ 105.  It stated that, at the merger convention, the new organization was to be referred to as "DSOC/NAM (soon to become ____)"; at a later celebration, "the name shall officially become ____ (formerly DSOC/NAM)"; and, at the new organization's first convention in October 1983, it was to use only its new name, "without references to DSOC or NAM."  *Id.*

---

[7] A DSOC memorandum reported that there had been "no serious obstacle to merger" at the NAM convention, tallying the votes as approving "454-59-22."  JSF ¶ 111.

The agreement stated that "formal merger" would occur at the Detroit convention, beginning with separate concurrent meetings of DSOC and NAM. *Id.* ¶ 106. At the end of those meetings, the agreement stated, "each organization will formally dissolve in order to constitute the unified organization at the subsequent merger convention." *Id.* ¶ 107; *see also id.* ¶ 139 ("merger convention" and "unity convention" used interchangeably). It provided that elections of officers, apportioned from each organization, would occur at the convention. *Id.* ¶ 108. The agreement established a new internal organizational structure; rules for merging local chapters; and a schedule for leadership meetings, a "unity celebration," and the new organization's first regular convention. *Id.* ¶ 110. It provided that DSOC's New York national office would become the new organization's headquarters, with NAM's Chicago national office becoming a branch office. *Id.* It stated that "national office staff will begin coordinating joint work between the two organizations immediately," and established publishing schedules and apportioned editorial board positions for the new organization's publications. *Id.* One publication would retain the title *Democratic Left*; the other was to be called *Socialist Forum*. *Id.* The agreement expressly contemplated that the new organization would be formally incorporated. *Id.* ¶ 119.

On January 27, 1982, the NAM political committee notified DSOC executives that "NAM's debt stands at $5,687," and noted that "[w]e have followed an austerity approach to salaries and staff travel over the last several months in order to minimize the debt that NAM would bring to the new organization." *Id.* ¶ 114. The same day, a NAM memorandum "propose[d] retiring $50,000 of the combined DSOC and NAM debt during 1982," so as to "leave the new organization with approximately $45,000 in debt at the beginning of 1983," which comprised "about 10% of the budget." *Id.* ¶ 116.

On February 2, 1982, NAM's political committee sent NAM's members a letter enclosing the merger agreement, new proposed constitution, and a referendum ballot.  *Id.* ¶ 121. It stated that DSOC had proposed a "quite satisfactory proposal for final budget planning that mandates maximum NAM role in implementing the negotiated decisions around staff, offices, outreach, commissions, etc. (see relevant sections of the merger agreement for these decisions)." *Id.*  It recommended "Democratic Socialists of America" as the new organization's name.  *Id.* The referendum passed, ratifying the merger agreement.  DSA 56.1 ¶ 14.

An undated iteration of the merger agreement stated that it had been ratified by both organizations, and referred to the new organization as "DSA."  JSF ¶ 118.  It scheduled the merger convention for March 1982 in Detroit.  *Id.* ¶ 119.

A flyer for that convention advertised that, on March 20, 1982, "the two major democratic socialist forces in the United States will meet in Detroit to create The DEMOCRATIC SOCIALISTS OF AMERICA."  *Id.* ¶ 126 (capitalization in original).  An article in the March 1982 issue of *Democratic Left* announced: "At last!  On March 20–21, 1982, DSOC and NAM delegates from all over the country will come to Detroit to ratify the merger of their organizations and give birth to the Democratic Socialists of America (DSA)."  *Id.* ¶ 127.  It included the following graphic:



28

Dkt. 48-46 ("Mar. 1982 *Democratic Left*").  The March 1982 issue of *Moving On*, in an article

titled "NAM and DSOC: Merger becomes a reality," reported that NAM and DSOC delegates

would "come together to begin the founding of the Democratic Socialists of America (DSA)."

*Id.* ¶ 128.

   ***March 1982: the Detroit merger convention***.  In March 1982, NAM and DSOC

representatives held a joint convention in Detroit.  *Id.* ¶ 129.  An announcement dated March 20,

1982 stated:

> The Detroit DSOC/NAM welcomes you to Detroit and to the founding convention
> of the Democratic Socialists of America.  In anticipation of the DSOC/NAM
> merger, our Detroit locals united in January 1982 and now have a joint executive
> board and local membership. . . .  We in Detroit DSOC/NAM look forward to being
> Democratic Socialists of America – Detroit.

*Id.* ¶ 130.  NAM's political committee and NIC "ensure[d] that the merger process within NAM

followed NAM's constitution and bylaws."  DSA 56.1 ¶ 10.  *In These Times* later reported: "The

first item on the convention agenda was the dissolution of the old organizations and separate

ratification of the new one.  DSOC and NAM gathered in separate rooms[, and when NAM

dissolved, its] finale resembled the last moments of a '60s commune, with tributes, tears and

raised fists."  JSF ¶ 136.

   The April 1982 issue of *Democratic Left* reported that NAM and DSOC had formally

merged at the convention to become DSA.  Dkt. 48-49 ("Apr. 1982 *Democratic Left*") at 6.  It

reported that "more than 300 delegates" attended "the formalities" in Detroit.  *Id.*  It stated that

both organizations had ratified DSA's constitution, and included photographs from the event

(reproduced below).  *Id.*

29





Steve Cagan

**A**FTER ALMOST THREE YEARS OF negotiations, the Democratic Socialist Organizing Committee (DSOC) and the New American Movement (NAM) joined in Detroit on March 20 to become the Democratic Socialists of America. More than 300 delegates and observers were on hand for the formalities. A brief sampling of pictures shows some of the highlights of the weekend, which included a well-attended Debs-Thomas dinner sponsored by Michigan DSA, conventions of both organizations at which the constitution of the new organization was ratified; an enthusiastic fundraising session Saturday afternoon; and addresses by, among others, Congress members John Conyers and George Crockett, DSA vice-chair Harry Britt; AFSCME secretary-treasurer Bill Lucy; former head of the National Women's Political Caucus Millie Jeffrey; DSA Chair Michael Harrington, DSA leaders Holly Graff, Deborah Meier and Roberta Lynch, and representatives of the Demo-

cratic Revolutionary Front of El Salvador. Caucus and committee meetings on Sunday morning marked the beginning of joint work.

The new organization now has four constitutional officers and three regional offices—in New York, Chicago, and San Francisco. In New York are Organizational Director Selma Lenihan, who remembers working for DSOC when it operated from a basement on New York's upper West Side; Political Director Gordon Haskell, who was elected by DSOC in its Saturday morning convention; and Field Director Leo Casey, who joins the staff on June 1.

Gordon Haskell has been an active socialist since 1935. He managed and edited *Labor Action* for the Independent Socialist League during the fifties and was an American Civil Liberties Union officer throughout the sixties. During the seventies he was resource development director for CARE, the international relief agency. Haskell served as president of the Association for Union Democracy from its inception. He was elected as interim political director of DSA following the resignation, for personal reasons, of



Gretchen Donart

Above: A week after unity DSAers gathered behind the new banner at a rally in Washington, D.C. against U.S. intervention in El Salvador; left: caught up in the celebratory spirit, a DSA member pledges money to the new organization at a rousing fundraising session led by Rhys Scoles; bottom: "Solidarity Forever" closed out the Debs-Thomas dinner honoring Ray Majerus; Jim Chapin, reputed to be the first person to have pushed for merger, signs the merger document.





*Id.*

Both NAM and DSOC dissolved at the March 1982 convention.  JSF ¶ 145; DSA 56.1 ¶ 23.  As provided in the ratified merger agreement, DSA's national executive committee ("NEC")—consisting of 28 DSOC and 14 NAM members—was elected at the convention.

Dkt. 59 ("Barclay Decl.") ¶ 24; DSA 56.1 ¶ 26.  DSA's senior leadership included Leo Casey, an earlier member of NAM's national committee; Holly Graff, an earlier member of NAM's political committee and NIC; and Jim Schoch, who had "served on the steering committee of San Francisco NAM."  JSF ¶ 150.  According to a declaration submitted by Graff, her position "as a paid member of the NAM Political Committee ended at the merger convention, and my new position as DSA's paid Program Director immediately began.  I did not miss a single paycheck and continued to work in the same Chicago office."  Dkt. 60 ("Graff Decl.") ¶ 32.  Glenn Scott and Bill Barclay—formerly NAM's "Southern organizer" and political committee member, respectively—also became DSA NEC members.  JSF ¶ 151.

By April 1982, the new organization's letterhead read: "Democratic Socialists of America, formerly DSOC/NAM."  *Id.* ¶ 146.  By October 1982, its letterhead read "DSA – Democratic Socialists of America," with a footer that stated, "formerly Democratic Socialist Organizing Committee/New American Movement."  *Id.* ¶ 147.

*April 1982: DSA's incorporation*.  Casey, as a member of DSA's NEC, prepared an undated memorandum titled, "DSA As Organizational Labyrinth: Everything You Were Afraid To Ask And Are Still Not Sure You Want To Know" ("Casey memorandum").  *Id.* ¶ 74.  It stated that NAM and DSOC had both operated as "unincorporated membership associations" before the merger.  *Id.* ¶ 75.  It explained that, after the merger, DSA's NEC "voted unanimously to adopt a legal organizational structure which was different from both of our predecessor organizations."  *Id.* ¶ 76.  DSA, it stated, had "two options: registration as an unincorporated membership organization qua political committee under section 527 of the I.R.S. code, or registration as a not-for-profit corporation under section 501(c)(4)."  *Id.* ¶ 77 (cleaned up).  DSA's NEC chose the latter: to incorporate DSA as a nonprofit corporation and seek recognition

under section 501(c)(4) of the Internal Revenue Code. *Id.* ¶ 78. It did so, the Casey

memorandum explained, in part to receive favorable tax treatment and to avoid DSA officers

facing potential personal financial liability. *Id.* ¶ 79; Dkt. 48-15 ("Casey Mem.") at 1–2.

On April 19, 1982, DSA was incorporated under the laws of the District of Columbia.

JSF ¶¶ 153–54. Its articles of incorporation do not reference NAM. *Id.* ¶¶ 155, 157. Upon

incorporation, DSA was organized as a social welfare organization under section 501(c)(4) of the

Internal Revenue Code. *Id.* ¶ 156.

*Later in 1982: DSA's post-incorporation financial crisis.* On May 27, 1982, DSA

published its inaugural issue of *Socialist Forum*. *Id.* ¶ 158.[8] It included a memorandum by

Gordon Haskell, one of DSA's first directors, addressing a "DSA Financial Crisis" resulting

from debt carried over from DSOC and NAM. *Id.* ¶ 158. The memorandum stated that,

although DSA was "being received with more interest, sympathy and acceptance than ever

before," "DSA is literally in danger of having to close our doors for lack of funds." Dkt. 48-54

("Haskell Mem.") at 8. It stated that readers were "entitled to an explanation." *Id.*

Two years before the merger, it recounted, DSOC had amassed "about $50,000 in debt."

*Id.* It stated:

> As the NAM and DSOC unity negotiating committees . . . put together the budget
> for the new organization, the dimensions of the problem began to reveal
> themselves. The truth appears to be that no one really knew just how much was
> owed. . . . By the time the DSOC National Board met last January, it had become
> apparent that the full debt was in the vicinity of $90,000–$100,000.

*Id.* at 9. A "special committee" of NAM and DSOC members "took heroic measures to reduce a

proposed budget" for the new organization, including salary reductions and abandonment of

plans to hire more personnel. *Id.* Projecting increased income from the 1982 merger, the

---

[8] In the first two issues of *Socialist Forum*, the articles' authorship was roughly evenly split
between former NAM and DSOC members. DSA 56.1 ¶ 36.

committee anticipated that the new organization would be able to pay off "about $35,000" in

debt.  *Id.*  By May 15, 1982, however, DSA was "in extremely serious trouble" financially

because those projections had not borne out.  *See id.* at 10.  The memorandum previewed that a

"panic button" letter would shortly be sent to the "membership for dues and contributions."  *Id.*

at 12.[9]

    ***Recent years: DSA's social media posts***.  In the past decade, DSA has "repeatedly posted

on social media about its roots in NAM and DSOC."  JSF ¶ 162.  *See, e.g.*, Dkt. 48-56 ("DSA

Social Media Posts") at 2 (June 1, 2017 Facebook post: "[NAM] eventually merged with

[DSOC] to form [DSA]"), 4 (March 25, 2017 Twitter post, picturing "working paper from the

socialist feminist organization NAM which merged with DSOC to create DSA in 1983"), 9

(September 13, 2023 Twitter post referring to "DSA predecessors DSOC and NAM").

               *b.*        *Overall Assessment*

    The assembled evidence, reviewed above, leaves no doubt that, under the plain and

ordinary meaning of the term, DSA is NAM's "successor."  NAM dissolved when it merged

with DSOC to form DSA.  The merger and creation of DSA were widely publicized, including

during years-long negotiations.  At the merger convention, NAM's senior officers immediately

joined DSA leadership.  They exercised their rights to guide DSA under its new constitution and

agreed-upon "political principles," as earlier ratified by NAM.  The assets—and, notably, the

debts—of NAM and DSA were carried forward to DSA.  Authors from both predecessor

---

[9] The memorandum noted that "[o]ne of our greatest deficiencies, from a fundraising and organizational viewpoint, is our lack of a consolidated, updated list of members which includes their dues and contribution status."  Haskell Mem. at 12–13.  The memorandum stated that Haskell anticipated creating "a computerized list" by the end of June [1982]—if we are lucky."  *Id.*  It reiterated: "If we are lucky.  We have not been very lucky so far in DSA."  *Id.*  DSA's electronic membership records began in 1993.  JSF ¶ 163.  It has "no membership records" from before then.  *Id.* ¶ 167.

organizations were published under DSA's *Socialist Forum*.  And DSA continued its organizational forebearers' ethos and mission, as codified by its constitution and the ratified merger agreement.  It is hard to conceive of any indicia of succession absent from this record.  And there is no claim—as Hecht's counsel, at argument, agreed—that some entity other than DSA was NAM's successor.

In the face of this wall of evidence, Hecht seizes on the fact that there was a one-month gap between DSA's creation at the March 20, 1982 merger convention and DSA's incorporation under District of Columbia law on April 19, 1982.  That is irrelevant.  The plain meaning of "successor" does not require the successor—where an entity—to be incorporated at all, let alone concurrently with its predecessor's dissolution.  In any event, the record reflects that the newly constituted DSA immediately functioned as NAM and DSOC's successor.  To choose just one indicium of continuity, Graff, a paid member of NAM's political committee before the merger, seamlessly continued her post-merger work as DSA's program director, and, without interruption, continued to receive her paychecks (now from DSA).

The evidence thus conclusively establishes that DSA is NAM's "successor," within the meaning of Greenberg's contingent beneficiary designation.  Because Greenberg's primary beneficiaries (his parents) predeceased him, DSA is entitled to the disputed retirement account.  The Court therefore grants summary judgment for DSA on its counterclaim against Hecht, and on Count One of the Complaint.[10]

---

[10] For the same reasons, the Court also grants (1) DSA's unopposed motion against NYU for an order directing NYU to cause the plan to distribute these benefits to DSA; and (2) NYU's motion against Hecht on Count Two's claims against NYU for benefits, under § 502(a)(1)(B).

34

### C.      NYU's Summary Judgment Motion: Whether NYU Breached its Fiduciary Duties to Greenberg and His Plan Beneficiaries

Hecht brings four claims against NYU, which assert that NYU breached its fiduciary duty to Greenberg and his plan beneficiaries, by failing to periodically confirm that the beneficiary information on his account was "up to date" and reflected his true intentions, and/or by failing to make a timely beneficiary determination.[11]  His bid for relief on these claims is premised on the Court's not having held—as it has—that, properly construed, Greenberg's beneficiary designation requires payment of the retirement account to DSA.  The parties refer to these collectively as Hecht's fiduciary duty claims.  *See, e.g.*, Oral Arg. Tr. at 65–69, 78–79.  Consistent with the parties' treatment, the Court addresses these collectively.

NYU moves for summary judgment on these claims.  It argues that ERISA did not require it, as plan administrator, to prompt Greenberg to clarify or update his beneficiary designation.  It argues that ERISA and its "plan documents rule" required NYU to honor the designation without regard to extrinsic conduct by Greenberg, from which a contrary subjective intention might be inferred (*e.g.*, Greenberg's 1996 designation of his sisters as beneficiaries of the separate Vanguard account).  To the extent Hecht faults NYU's conduct after Greenberg's death, it argues that it acted prudently in investigating, consistent with Greenberg's designation, whether DSA was NAM's successor, ultimately suspending that investigation in deference to

---

[11] These are: (1) under ERISA § 502(a)(1)(B), to have Greenberg's "true intentions honored" with respect to the "intended beneficiaries" of the disputed retirement account; (2) under ERISA § 502(a)(3), for a declaration that NYU breached its fiduciary duties, surcharge or disgorgement against NYU, and constructive trust over the disputed proceeds; (3) under ERISA §§ 404, 409, and 502(a)(2), for NYU's "fail[ure] to engage in a prudent process for periodically confirming that the beneficiary information" on Greenberg's account was "up-to-date" and reflected Greenberg's "true intentions"; and (4) under common law, to the extent that ERISA does not cover the plan, equitable relief requiring NYU to pay the amount of the retirement benefits to Hecht, including "all lost interest and earnings."  Compl. ¶¶ 76–99.

this litigation.  Hecht opposes the motion.  He argues that Greenberg's designation of his sisters as the Vanguard account beneficiaries obliged NYU to affirmatively inquire of him whether he still intended to leave the retirement account to NAM or a successor in preference to his estate; that the designation term "any successor thereof" was ambiguous, obliging NYU to prompt Greenberg to clarify it; that the reminders NYU sent plan participants prompting them to keep beneficiary designations up-to-date were insufficient as to Greenberg; and that, after Greenberg's death, NYU, in breach of its duties to beneficiaries, failed to decide Hecht's claim within 90 days or notify him that it needed an extension.

NYU is entitled to summary judgment on these claims.  It did not breach fiduciary duties to Greenberg during his lifetime or to his plan beneficiaries after his death.

ERISA's central purpose is to "protect beneficiaries of employee benefit plans." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009).  It thus imposes fiduciary duties of prudence and loyalty on plan administrators.  *In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).  The duty of prudence requires that administrators act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  The duty of loyalty requires that administrators act "solely in the interest" of plan participants and beneficiaries.  *Id.* § 1104(a)(1).

The record here reflects that NYU did not breach its fiduciary duties to Greenberg or his plan beneficiaries with respect to the disputed retirement account.  Hecht's initial theory of breach is that NYU failed to proactively urge Greenberg to revisit his 1975 beneficiary

36

designation.  That claim fails for two reasons.  First, Hecht, who bears the burden on this claim, has not adduced any evidence that NYU did not at some point prompt Greenberg to revisit his 1975 designation.  Greenberg is deceased.  And, as the parties agreed at argument, NYU's records do not purport to capture all its communications with Greenberg, between 1975 and his death 49 years later, with respect to the beneficiaries of the disputed retirement account.  It is lost to history whether any such communications occurred.  Hecht's conjecture that such a conversation did not ever occur is not a substitute for evidence.  In the absence of affirmative evidence, Hecht, as a matter of basic civil procedure, cannot reach a jury on this theory of fiduciary duty breach.  *See, e.g.*, *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015) ("Where, as here, the party opposing summary judgment bears the burden of proof at trial, summary judgment should be granted if the moving party can point to an absence of evidence to support an essential element of the nonmoving party's claim." (citation omitted)); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (same).

Second, even if Hecht had adduced admissible evidence that NYU never prompted Greenberg to revisit his designations, as a matter of law, it did not have a fiduciary duty to make that personalized outreach to Greenberg.  It is undisputed that NYU and TIAA's summary plan descriptions ("SPDs") were delivered periodically to plan participants, including Greenberg. These reminded plan participants that they were responsible for reviewing and updating their beneficiary designations.  *See* Dkt. 55 ("Petti Decl.") ¶¶ 12–15; Dkt. 48-2 ("SPD") at 11 (instructions for designating beneficiaries).  No more was needed.  For the reasons reviewed above, Greenberg's designation of NAM or "any successor thereof" was not textually vague, so as, arguably, to require plan administrator NYU to seek clarification.  That designation merely required, after Greenberg's death, factual investigation as to the status of NAM and the identity

37

of its successor, as NYU was in the process of doing at the time of this lawsuit, and as was ultimately completed in this litigation with the benefit of discovery.  And Hecht has not cited any law under which Greenberg's 1996 designation of his sisters as beneficiaries of the separate and smaller Vanguard account triggered a duty on NYU's part to affirmatively prod Greenberg whether he wished to maintain or change the beneficiaries for the disputed account.

On the contrary, Supreme Court and Second Circuit decisions underscore the absence of any such legal duty.  In *Kennedy*, the Supreme Court held that a plan administrator had "properly disregarded [a divorce waiver outside the plan] owing to its conflict with the designation made by the former husband in accordance with plan documents."  555 U.S. at 288.  The Court explained: "[B]y giving a plan participant a clear set of instructions for making his own instructions clear, ERISA forecloses any justification for enquiries into nice expressions of intent."  *Id.* at 301.  The "cost of less certain rules," the Court noted, was "too plain": "administrators would be forced to examine a multitude of external documents that might purport to affect the dispensation of benefits," and "be drawn into litigation" over the "meaning and enforceability" of conflicting expressions of intent outside the plan.  *Id.* (cleaned up).  In *Krishna*, the Second Circuit likewise stated that it would be "counterproductive to compel" plan administrators to "look beyond [] designations into varying state laws regarding wills, trusts and estates, or domestic relations to determine the proper beneficiaries of [] distributions."  *Krishna*, 7 F.3d at 16.

Under these precedents, NYU's fiduciary duties to Greenberg or his beneficiaries did not compel it to second-guess, or prompt Greenberg to revisit, his stated beneficiary designations as to the retirement account.  This case, in fact, supplies an excellent illustration of the wisdom of the principles stated in *Kennedy* and *Krishna*.  At argument, NYU's counsel proffered that there

are thousands—if not tens of thousands—of participants in its retirement plan. Oral Arg. Tr. at 74. The same is surely true of the plans administered by innumerable universities, corporations, non-profits, and other institutions. Under Hecht's liability theory, to avoid exposing these institutions to post-mortem claims of a fiduciary duty breach by persons or entities disappointed not to be named as primary beneficiaries, NYU and like plan administrators would have to affirmatively review extra-plan information accessible to them about each plan participant, and analyze whether any such information (a birth, a death, an illness, an engagement, a marriage, a separation, a divorce, a promotion, job tenure, a new job, a retirement, the opening of a new retirement account, and, as here, the designation of different beneficiaries on a new account) conceivably might lead the participant to alter existing designations. And, where the administrator did not do so and was found liable for this inaction, a court, on a fiduciary duty claim like Hecht's, would be obliged to determine how, if at all, the deceased plan participant would have revised his stated beneficiaries. Only in rare cases could the answer to that inquiry be resolvable other than by conjecture. In this case, for example, the record, as developed, would not supply a solid basis for determining with assurance that Greenberg, who died intestate after more than three decades as a dues-paying member of DSA, would have supplanted DSA with his sisters or his nephews as beneficiaries of his retirement account, as opposed to designating different beneficiaries on his different plans. And the imponderability of this exercise would have been compounded by the uncertain date on which to find a fiduciary duty breach and to gauge the participant's preferred beneficiary. Did NYU's breach of fiduciary duty occur in 1982, when NAM was succeeded by DSA? In 1996, when Greenberg opened the Vanguard account? On the date(s) his sisters each died? On his retirement in 2022?

39

Immediately preceding his death in 2024?  Or on multiple of the above dates?  ERISA case law does not supply any charter for this costly and likely fruitless exercise.[12]

Hecht alternatively faults NYU for not identifying the proper beneficiary of the disputed retirement account within 90 days of Hecht's claim.  Even if that delay were held a breach, that argument would not avail Hecht, given the Court's finding that DSA, not Greenberg's estate, was the prevailing beneficiary.  In any event, the record does not support Hecht's theory that the delay bespoke a fiduciary duty breach.  It reflects that, as of when NYU suspended its research in deference to this lawsuit, filed 22 days after the 90-day deadline, it was attempting to access sufficient historical documents as to NAM and DSA to enable it to reach a reliable conclusion as to the identity of NAM's successor.  *See* Hecht Opp'n to NYU at 9 (describing process of identifying the beneficiary as not "purely mechanical").  NYU's efforts to resolve that question were consistent with its duties to all potential beneficiaries (including DSA) to correctly identify the prevailing beneficiary.  Promptly upon receiving notice that Hecht disputed DSA's entitlement to the retirement benefits, and even before Hecht submitted a formal claim, NYU placed a hold on disbursing those benefits while it and TIAA sought documentation from DSA regarding its relationship to NAM.  *See* JSF ¶¶ 169, 179–81, 186; TIAA-NYU Emails at 3.  And NYU kept Hecht up to speed on its investigation.  Where an "administrator communicates with

---

[12] The cases cited by Hecht are all highly inapposite (and some reject a claim of fiduciary breach even by the circumstances presented there).  *See, e.g.*, *In re DeRogatis*, 904 F.3d 174, 194–96 (2d Cir. 2018) (no fiduciary duty breach where summary plan description "contained all the information necessary"); *Hannan v. Hartford Fin. Servs., Inc.*, 688 F. App'x 85, 89–90 (2d Cir. 2017) (fiduciary duty claims dismissed where no allegations that plan administrator made material misrepresentations or omissions); *Bell v. Pfizer Inc.*, 499 F. Supp. 2d 404, 410–11 (S.D.N.Y. 2007) (denying summary judgment where factual issues remained whether plaintiff relied on material misrepresentations by employer and administrator); *Herman v. Time Warner Inc.*, 56 F. Supp. 2d 411, 417 (S.D.N.Y. 1999) (allegations that employer had caused employees' misclassification as independent contractors adequately stated claim for fiduciary duty breach).

the claimant regarding the status of [his] appeal, acts in good faith, and does not delay its decision unreasonably, its failure to comply with the regulation deadlines" does not also breach its fiduciary duties. *Robinson v. Metro. Life Ins. Co.*, No. 06 Civ. 7604, 2007 WL 3254397, at *2 (S.D.N.Y. Nov. 2, 2007).

## CONCLUSION

For the above reasons, the Court:

1. Grants DSA's motion for summary judgment on its counterclaim for declaratory relief, and denies Hecht's motion for summary judgment on that claim;

2. Denies Hecht's motion for summary judgment on his claims for declaratory and related relief, and grants DSA's motion for summary judgment on those claims;

3. Grants DSA's motion for summary judgment on its cross-claim against NYU, for an order directing it to distribute Greenberg's retirement account to DSA; and

4. Grants NYU's motion for summary judgment on Hecht's claims against it, including for breach of fiduciary duty.[13]

Within a week of this decision, DSA and NYU are to submit a proposed judgment consistent with this decision. The Clerk of Court is respectfully directed to terminate all pending motions.

---

[13] One of these claims, Count One, independently fails because it impermissibly seeks relief, under § 502(a)(3)'s catchall provision, that is redundant of Count Two's benefits claim under § 502(a)(1)(B). *See Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (§ 502's catchall provisions allow "appropriate relief for injuries caused by violations that § 502 *does not elsewhere adequately remedy*" (emphasis added)); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89 (2d Cir. 2001) (similar). A party cannot obtain the benefits he seeks under § 502(a)(1)(B) by styling the claim as one for equitable relief under § 502(a)(3). *See Whelehan v. Bank of Am. Pension Plan for Legacy Companies-Fleet-Traditional Ben.*, 621 F. App'x 70, 72 (2d Cir. 2015) (summary order) (summary judgment warranted, based on such duplication); *Mead v. Andersen*, 309 F. Supp. 2d 596, 598–99 (S.D.N.Y. 2004) (same, on motion to dismiss).

42

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: July 27, 2026
       New York, New York